IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

THE REDEVELOPMENT AGENCY OF THE
CITY OF STOCKTON, a public
body, corporate and politic,

        Plaintiff,

    v.

BURLINGTON NORTHERN AND SANTA
FE RAILWAY CORPORATION, UNION
PACIFIC RAILROAD COMPANY, AND
DOES 1 THROUGH 100,

        Defendants.       /

No. Civ. S-05-02087 DFL JFM

Memorandum of Opinion
and Order

    This is a diversity action under state environmental laws
brought by the Redevelopment Agency of Stockton (RAS) seeking
cost recovery and injunctive relief against the Union Pacific
and Burlington Northern railroads (Railroads).  The RAS alleges
that the Railroads are liable for petroleum contamination found
on land they once used and owned, which is now a RAS
redevelopment project area.  The parties have filed cross
motions for summary judgment, and the RAS has filed a renewed
motion for a preliminary injunction.

1

I. Facts

The court finds that the following facts are established by the cross motions.

In 1968, the State of California decided to build a freeway interchange in Stockton to connect Interstate 5 and State Highway 4.  The proposed interchange was incompatible with existing railroad tracks owned by defendant Railroads,[1] so the State entered into a contract (the 1968 agreement) with the Railroads to build substitute tracks at the State's expense.  At issue in this lawsuit are three contiguous parcels of land known as Areas 3, 4, and 24 (the Property) over which this replacement track ran.  In consultation with the Railroads and using plans they provided, the State performed the grading work for the new tracks, including installing an underground perforated drainage pipe, or "french drain," along the track route.[2]  The purpose of

_____

[1] The railroads then involved were the Western Pacific Railroad Company, the Atchison, Topeka and Santa Fe Railroad Company, and the Southern Pacific Company.  The defendants in this case, Union Pacific Railroad Company and Burlington Northern and Santa Fe Railway Corporation, are the successors in interest to the three original railroads.  The court refers to all of these entities interchangeably as "the Railroads."

[2] The Railroads argue unpersuasively that they had nothing to do with the design, installation, use or maintenance of the french drain.  The RAS has produced substantial evidence that the Railroads were closely involved in the design and approval of the drain.  See Decl. of Warren Boalt; Decl. of Robert Hargis; Letter from A. W. Carlson to Warren Boalt of November 9, 1966.  Against this evidence, the Railroads proffer expert testimony that it was not the Railroads' practice to use the particular type of corrugated pipe from which the french drain was made, and that railroad drainage pipes generally were not placed parallel to and underneath tracks.  The Railroads' proffered evidence fails to create a genuine issue of fact as to

the french drain was to facilitate drainage and stabilize the
soil, which otherwise would have been too wet to support the
tracks.  When the grading was finished, the Railroads built
tracks at the State's expense.  The Railroads began using the
new tracks in 1970 and continued to use them until 1988.

Under the 1968 agreement, the Railroads agreed to maintain
the new tracks, roadbed and drainage.  The State agreed to
acquire and, by separate documents, to convey to the Railroads
all rights of way necessary for the construction and operation
of substitute tracks.  The State finally conveyed title to the
substitute tracks and underlying land to the Railroads in 1983.

In 1988, under threat of condemnation, the Railroads sold
their interests in the Property to the RAS, which planned to
develop the land.  The RAS finally began development in 2004, at
which time petroleum contamination was found in the soil of Area
3 along the path of the french drain, in the groundwater under
Area 3, and elsewhere on the Property.  As the Railroads
conceded at oral argument, the french drain served as a
preferential pathway for this contamination, which would have
taken a different course were it not for the drain.  Were it not
for the french drain, the Property would not have become
polluted with petroleum.[3]

Upon discovery of the contamination, construction on Area 3
was halted.  Petroleum also was found in soil at the border

---

whether the Railroads were involved in the design and approval
of the french drain at issue here.

   [3] See Expert Opinion Report of Dawn A. Zemo at 3; Rebuttal
Report of James Clark at 3.

between Areas 3 and 24.   Testing showed that the petroleum contamination was at least twenty years old.   Certain other contaminants, including lead, arsenic and hydrocarbons called PAHs, subsequently also were found on the Property.

The likely source of the petroleum contamination was a nearby L&M petroleum facility.   There were a number of spills from the L&M facility in the early 1970s, including a spill of 3,000-6,000 gallons of diesel in 1974 for which the Coast Guard cited L&M because the diesel traveled through storm drains into the Stockton Channel.[4]   The L&M facility ceased operations in 1982.

---

[4] In its opposition to the Railroads' motion, the RAS for the first time asserts that the Railroads owned a track at the L&M facility.   The RAS argues that the Railroads' ownership of this track raises a material issue as to whether the Railroads are responsible for the L&M spills.

It does not.   First, the RAS raised this issue for the first time in their opposition to the Railroads' motion for summary judgment.   This theory of liability is not mentioned in the RAS's disclosures, interrogatory responses, or expert reports.   No discovery has been conducted on the issue.   The RAS fails to demonstrate a substantial justification for its failure to raise the issue earlier.   See Fed. R. Civ. P. 37 (c)(1); Pre-Trial Scheduling Order of December 12, 2005.

Second, the Railroads aver that the track in question, though technically on L&M's property, was fenced off from the L&M facilities and had nothing to do with any spills.   The RAS does not present any evidence that the Railroads' tracks were involved in the L&M spills.   Therefore, the RAS's allegation that the Railroads owned a track at L&M does not raise a genuine issue of material fact as to whether the Railroads were responsible for the spills at L&M.

4

RAS first sent corrective action notices[5] to the Railroads requesting that they prepare remedial action plans for Area 3 on August 25, 2004.  At the same time, the RAS was undertaking its own remediation of the Property, which it had largely finished by October 24, 2004.  In late 2004 and early 2005, the RAS sent the Railroads similar notices about Areas 4 and 24.  To date, the Railroads have not responded to any of the RAS's notices.

In late 2005, the RAS filed suit in state court to force the Railroads to pay for and take over the remediation of the Property.  The Railroads removed the case based on diversity.  On April 11, 2006, the court denied the RAS's motion for a preliminary injunction.

## II. Polanco Act Claims

The RAS's first two causes of action seek cost recovery and an injunction for violation of the Polanco Act, Cal. Health & Safety Code § 33459 *et seq.*, which "authorizes redevelopment agencies to remediate contaminated properties within a project area."  City of Modesto Redevelopment Agency v. Superior Court, 119 Cal. App. 4th 28, 34 (2004).  Under the Polanco Act, a "responsible party" is anyone who would be a responsible party under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) or under the California Porter-Cologne Act (Cal. Water Code § 13304).  Id. (citing Cal. Health & Safety Code § 33459(h)).  As discussed

---

[5] The Railroads object to calling these letters "corrective action notices."  The basis for their objection is unclear, however, as the letters are headed "Notice of Corrective Action," cite relevant authority, and notify the Railroads that they are potentially responsible parties.

below, the court finds that the Railroads are not responsible parties under CERCLA but that they are under the Porter-Cologne Act and hence the Polanco Act.  But the court also finds that the Railroads may not be held liable under the Polanco Act for the remediation of Area 3 because the RAS failed to comply with the Act's notice requirements.

A. CERCLA

A potentially responsible party (PRP) under CERCLA is "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2); see also Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 870 (9th Cir. 2001) (en banc) ("CERCLA generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed.") (citation and internal quotation marks omitted).  The RAS argues that the contamination resulted from a "disposal" of hazardous materials within the meaning of CERCLA, and that the Railroads both owned and operated the Property during the period when the disposal likely occurred.  The Railroads respond that emission of petroleum from the french drain is not a CERCLA disposal, that they did not own the Property when it occurred, and that they never operated the french drain.  As discussed below, the court finds that the french drain's emission of petroleum was indeed a CERCLA disposal, but that the Railroads were neither owners nor operators within the meaning of CERCLA at the relevant time.

////

////

i. <u>Disposal</u>

CERCLA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  42 U.S.C. § 6903(3).  In <u>Carson Harbor</u>, the Ninth Circuit held that the passive migration of contaminants through soil did not constitute a CERCLA disposal.  270 F.3d at 879.  But rather than create a bright-line rule that passive migration is never a CERCLA disposal, the court "examine[d] each of [§ 6903(3)'s] terms in relation to the facts of the case and determine[d] whether the movement of contaminants [was], under the plain meaning of the terms, a 'disposal.'"  <u>Id.</u>  The court concluded that although the passive movement of tar-like petroleum byproducts and "slag" through wetlands might fairly be characterized as "spreading, migration, seeping, oozing, and possibly leeching . . . certainly none of those words fits within the plain and common meaning of discharge, . . . injection, dumping, . . . or placing."  <u>Id.</u> (quoting § 6903(3)) (internal quotation marks omitted).  The court also stated that "the gradual spread here [cannot] be characterized as a 'deposit,' because there was neither a deposit by someone, nor does the term deposit encompass the gradual spread of contaminants."  <u>Id.</u>

The Railroads argue that this is a passive migration case like <u>Carson Harbor</u>.  The RAS argues that the case is

distinguishable from Carson Harbor because the contamination
here resulted from human conduct – the installation of the
drainage pipe – and therefore that the case is more analogous to
Kaiser Aluminum & Chem. Corp. v. Catellus. 976 F.2d 1338 (9th
Cir. 1992). There, the Ninth Circuit held that excavating
contaminated soil already present on a property and spreading it
more widely on that property constituted a CERCLA disposal. Id.
at 1342. Following the mode of analysis in Carson Harbor,
however, the task at hand is not to decide which case is more
analogous to the situation here. Rather, it is to determine
whether the re-direction of petroleum contaminants, through a
french drain, is a "discharge, deposit, injection, dumping,
spilling, leaking, or placing" as these terms are used in §
6903(3).

The french drain was installed as a "preferential pathway"
for groundwater. It was, by design, riddled with holes to
permit the free entry and exit of water along its entire length.
Its purpose appears to have been to facilitate the movement of
water through soil. Petroleum released elsewhere traveled
through the french drain and polluted the Property. But for the
french drain, the Property would not have been polluted with
petroleum. In these circumstances, the words "deposit" and
"placing" accurately describe what happened. See Webster's
Third New Int'l Dictionary 605 (Unabridged ed. 1986) (defining
"deposit" as, inter alia, "to lay down or let fall or drop by a
natural process"); Id. at 1727 (defining "place" as, inter alia,
"[to] cause to rest or lie"). Indeed, it is awkward to describe
what happened here without recourse to one of these terms.

Although the french drain did not create or concentrate the polluting substance, it was a but-for cause of its placement or deposit on the Property.  Because the process by which this happened is accurately described by at least one of the terms listed in § 6903(3), the court finds that the french drain caused a CERCLA disposal.

   ii. <u>Owner Liability</u>

The RAS argues that the Railroads are CERCLA PRPs as owners of the Property when the contamination likely occurred.  But although the State agreed to convey ownership of replacement tracks in the 1968 agreement and the Railroads began using the new tracks in 1970, it is uncontested that the State did not deed the Property to the Railroads until 1983, which was well after the contamination likely occurred.  The RAS argues, however, that the Railroads were *de facto* or equitable owners of the Property from the beginning, because the 1968 agreement "obligated the State to acquire and then convey to the Railroads all property necessary for construction and operation of substitute trackage."  And although there was an inexplicable delay until 1983 in deeding the Property, the RAS argues that the 1968 agreement gave the Railroads the full bundle of rights associated with ownership.  The RAS cites a number of cases in which courts have stated that CERCLA owner liability might attach to a defendant holding less than a fee interest in the contaminated property.

The problem with this argument, as the Railroads point out, is that the 1968 agreement did not specify any particular parcel of property to be transferred or a date upon which the transfer

was to take place.  Under the agreement, the State was bound only "[t]o acquire and convey to the Railroads by separate documents . . . all rights of way necessary for the construction and operation of substitute trackage . . . ."  Thus, although it created a contractual obligation for the State to convey *some* land at *some* future time, the agreement did not convey an interest in any particular piece of land.  Based on the language of the agreement, it would appear that the State could have conveyed different land to the Railroads.  Indeed, even after construction of the replacement tracks, the State may have had no contractual obligation to convey the particular land on which they were built.  Had it discovered a compelling reason to keep that land, the State might have built yet another set of tracks elsewhere and conveyed that land to the Railroads.  And because the agreement specified no deadline for the conveyance, the State had an indefinite time with which to work.  The State did not convey the Property to the Railroads until 1983, some fifteen years after the agreement was signed.

The 1968 agreement's failure to identify the land to be conveyed or the timing of conveyance distinguishes this case from those in which courts have found equitable title conveyed upon the signing of an executory contract.  <u>See</u>, <u>e.g.</u>, <u>Los Angeles Dodgers, Inc. v. County of Los Angeles</u>, 256 Cal. App. 2d 918 (1967).  And it distinguishes this case from <u>United States v. Union Corp.</u>, 259 F.Supp.2d 356 (E.D. Pa. 2003), where the court found that a defendant holding equitable title to specific property, but lacking legal title, was an owner within the meaning of CERCLA.  The present case is also distinguishable

from Commander Oil Corp. v. Barlo Equip.Corp., because it does not involve a lease.  215 F.3d 321, 331 (2d Cir. 2000) (speculating that "certain lessees may have the requisite indicia of ownership vis-a-vis the record owner to be *de facto* owners" under CERCLA).

   The court is guided by Long Beach Unified School District v. Dorothy B. Godwin California Living Trust, where the Ninth Circuit declined to expand the meaning of "owner" under CERCLA to include the holder of a mere easement.  32 F.3d 1364, 1369 (9th Cir. 1994).  The court noted that CERCLA incorporates "the common law definition of its terms," and that "[t]he common law does not regard an easement holder as the owner of the property burdened by it." Id. at 1368 (citation omitted).  Here, the RAS has adduced no authority indicating that a contract to convey unspecified land at an unspecified time creates a present ownership interest in particular land.  The court finds that the Railroads did not own the Property for CERCLA purposes until the State conveyed title in 1983.[6]

   iii. Operator Liability

   The RAS argues that the Railroads are CERCLA PRPs because they "operated" the french drain when the contamination occurred.  The Railroads argue that they did not operate the drain because they performed no maintenance on it and were unaware of its existence.  They also argue that even if they

---

   [6] One can easily imagine the State arguing under different circumstances that it retained ownership rights in the Property until it conveyed title in 1983.  Muddying the definition of "owner," a term that should be clear, would only serve to increase the complexity and cost of CERCLA litigation.

might be said to have operated the drain in some general sense,
they did not operate it within the meaning of CERCLA.

Leaving aside the issue of whether the Railroads were aware
of the french drain when the contamination occurred or might
have operated it in some general sense, it is clear that they
were not "operators" within the meaning of CERCLA.  In United
States v. Best Foods, 524 U.S. 51, 66 (1998), the Court held
that for a defendant to be liable as an operator under CERCLA,
it "must manage, direct, or conduct operations specifically
related to pollution, that is, operations having to do with the
leakage or disposal of hazardous waste, or decisions about
compliance with environmental regulations."  See City of Moses
Lake v. United States, 458 F.Supp.2d 1198, 1226 (E.D. Wash.
2006) ("The question is whether under the totality of the
circumstances, did the person or entity manage, direct or
conduct operations specifically related to pollution.")
(citation and internal quotation marks omitted); Taliesen Corp.
v. Razore Land Co., 135 Wash. App. 106, 127 (2006) ("[O]perator
liability under [CERCLA] depends upon authority to control
decisions about how to dispose of waste, not mere physical
control over the instrumentality that causes disposal or
release.")

There is no evidence that the Railroads "manage[d],
directe[d] or conduct[ed] operations specifically related to
pollution" in connection with the french drain.  Best Foods, 524
U.S. at 66.  The perforated french drain never was intended to
serve as a conduit for hazardous materials, nor, to the extent
that they may have operated it in a general sense, did the

Railroads do so for a purpose related to pollution.
Accordingly, under <u>Best Foods</u>, the Railroads cannot be held
liable under CERCLA as operators.

Because the Railroads are neither owners nor operators
within the meaning of CERCLA, they are not CERCLA PRPs.

B. <u>Porter-Cologne</u>

Because the Railroads are not PRPs under CERCLA, they may
be liable under the Polanco Act only if they are responsible
parties under the Porter-Cologne Act.  Under Porter-Cologne, a
responsible party is "[a]ny person who has discharged or
discharges waste . . . or who has caused or permitted, causes or
permits, or threatens to cause or permit any waste to be
discharged or deposited where it is, or probably will be,
discharged into the waters of the state and creates, or
threatens to create, a condition of pollution or nuisance."
Cal. Water Code § 13304(a).  Porter-Cologne is "harmonious with
the common law of nuisance," under which "liability . . . does
not hinge on whether the defendant owns, possesses or controls
the property, nor on whether he is in a position to abate the
nuisance."  <u>City of Modesto Redevelopment Agency v. Superior
Court</u>, 119 Cal. App. 4th 28, 37-38 (2004).  Rather, liability
attaches if a defendant "created or assisted in the creation of
the nuisance."  <u>Id.</u> at 38.  "[E]ven a relatively minor
contribution to a discharge may support a finding of
responsibility."  <u>Id.</u> at 41 (citing <u>In re County of San Diego</u>
(Order No. WQ 96-2, Feb. 22, 1996) 1996 WL 101751, at *5 (Cal.
St. Wat. Res. Bd.)); <u>see</u> <u>also</u> <u>City of Modesto</u>, 119 Cal. App. 4th
at 41 ("[W]e disagree with defendants' contention that only

those who are physically engaged in a discharge or have the ability to control waste disposal activities are liable under section 13304."); <u>Environmental Law Handbook</u> 16 (Thomas F.P. Sullivan, <i>et al.</i>, eds., 18th ed. 2005) ("In general the courts are moving to strict liability for environmental nuisances so that, practically speaking, there are few good defenses to liability.").

The Railroads argue that they neither "discharged" nor "caused or permitted" the discharge of any waste.  Recycling their argument under CERCLA, the Railroads contend that the plain meaning of "discharge," excludes what they characterize as the passive migration involved here.  Rather, according to the Railroads, "discharge" means "the initial release of a potential contaminant from confinement (such as a tank or drum), not passive migration through soil and groundwater."

The Railroads read "discharge" too narrowly, as it is used in Porter-Cologne.  In <u>Lake Madrone Water District v. State Water Resources Control Board</u>, the California Court of Appeal held that the term "discharge" in the Porter-Cologne Act should be given its ordinary meaning: "to relieve of a charge, load or burden; . . . to give outlet to: pour forth: EMIT."  209 Cal. App. 3d 163, 174 (1989) (quoting <u>Webster's New Int'l Dictionary</u> 644 (3d ed. 1961)).  The court noted that broadly defining "discharge" "is congruent with the Legislature's directive that water quality control means the regulation of any activity or factor which may affect the quality of the waters of this state."  <u>Id.</u> (quoting Cal. Water Code § 13050(i)) (internal quotation marks omitted).  Reading "discharge" broadly is also

necessary for Porter-Cologne to harmonize with nuisance law.
See City of Modesto, 119 Cal. App. 4th at 37-38.

Under this broad definition of the term, the channeling and emission of petroleum by the french drain was a discharge.  The Railroads concede that the french drain changed the petroleum's course and ultimate location.  Although this may be a relatively modest contribution to the overall pollution problem caused by a third party's spill or spills, it is nevertheless one but-for cause of a "condition of pollution or nuisance" on the Property.

The Railroads assert that in City of Modesto the court found that Porter-Cologne liability does not arise from mere passive migration.  Leaving aside whether the present case involves truly passive migration – the Railroads did play a role in bringing the french drain into existence – City of Modesto was not a passive migration case and stands for no such proposition.  City of Modesto does state, as the Railroads assert, that "the Legislature did not intend the [Porter-Cologne] act to impose liability on those with no ownership or control over the property or the discharge, and whose involvement in a discharge was remote and passive."  Id. at 43.  But this statement came in the context of identifying the limits of Porter-Cologne liability for product manufacturers with no role in a discharge beyond selling the discharged products to the dischargers.  City of Modesto holds that nuisance law (and, thus, the Porter-Cologne Act) "is not intended to serve as a surrogate for ordinary products liability."  Id. at 39.  But City of Modesto does nothing to limit the scope of nuisance liability in cases not involving a discharged product's

manufacturer.  In fact, the case unambiguously describes general nuisance law as being exceedingly broad.  Id. at 38 ("[N]ot only is the party who maintains the nuisance liable but also the party or parties who create or assist in its creation are responsible for the ensuing damages.") (quoting Mangini v. Aerojet-General Corp., 230 Cal. App. 3d 1125, 1137 (1991)).  Thus, City of Modesto offers the Railroads no support.

Finally, the Railroads' connection to the french drain is sufficiently strong that they may be held liable for the discharge.  The Railroads provided or approved the plans and specifications for the grading and drainage.  They constructed the tracks and agreed to maintain the tracks and drainage.  In 1974, they were the exclusive user of the tracks, of which the french drain was an integral part, when the petroleum traveled through the drain and polluted the Property.  Under Porter-Cologne, this is enough to open the door to liability.  See City of Modesto, 119 Cal. App. 4th at 37-38.

C. Third-Party Defense

The Railroads argue that even if they might otherwise be responsible parties, they are entitled to the Polanco Act's third-party defense.  See Cal. Health & Safety Code § 33459.4(b).  This defense, which the Polanco Act borrows from CERCLA, is available to a defendant who can establish, among other things, that the hazardous release was caused "solely" by "an act or omission of a third party other than . . . one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant."  42 U.S.C. § 9607(b).  "Courts construe CERCLA's

limited defenses narrowly to effectuate the Act's broad policies." Kelley v. Thomas Solvent Co., 727 F.Supp. 1532, 1540 n.2 (W.D. Mich. 1989) (citing New York v. Shore Realty Corp., 759 F.2d 1032, 1048-49 (2d Cir. 1985).

The Railroads' invocation of the third-party defense fails for two reasons.  First, as already discussed, the Railroads participated in the design and approval of the substitute tracks' drainage, including the french drain, which was a but-for cause of the contamination of the Property by the petroleum. Thus, the Property's contamination is not "solely" attributable to the conduct of third parties.

Second, there is no dispute that the State of California installed the french drain in the course of performing under the 1968 agreement.  Therefore, the State also played a causal role in the contamination of the Property.  Because the Railroads had a contractual relationship with the State "in connection" with the Property, and the State had a hand in the Property's contamination, the Railroads cannot benefit from the third-party defense.

D. Polanco Act Procedural Defenses

The Railroads argue that they cannot be held liable under the Polanco Act because the RAS failed to comply with the Act's various procedural requirements.  First among these is that a redevelopment agency give responsible parties sixty-days' notice and the opportunity to submit their own remediation plan to perform the work before the agency undertakes the work on its own.  Cal. Health & Safety Code § 3349.1(b)(2).  The Railroads'

argument that the RAS failed to satisfy this requirement has merit.

It is uncontested that on August 25, 2004 the RAS sent letters to the Railroads requesting that they prepare remedial action plans for Area 3.  But the RAS did not wait the requisite sixty days before undertaking its own remediation.  By October 24, 2004 – sixty days after the RAS's initial letters went out – the RAS had already submitted its own workplan to the RWQCB, finished excavating Area 3 and begun disposing of contaminated soil.  In short, the RAS had nearly completed the remediation of Area 3 by the time the deadline passed for the Railroads to submit a remediation plan of their own.  Thus, the Railroads argue, the RAS failed to comply with the Polanco Act's procedural requirements and its claim must fail.

With respect to its admitted failure to give the Railroads sixty-days' notice before beginning work, the RAS makes two arguments.  First, it asserts that its failure caused the Railroads no harm because they never submitted their own work plan.  On this basis, the RAS argues that it substantially complied with the Act.  Second, the RAS argues that it was not required to comply with the sixty-day requirement because it notified the Railroads that the hazardous condition on Area 3 required immediate action.  Under the Polanco Act, the sixty-day notice requirement does not apply if a redevelopment agency "determines that conditions require immediate action."  Health & Safety Code § 33459.1(c)(2).

The RAS's substantial compliance argument is unpersuasive. The RAS cites a recent opinion by a California Superior Court,

City of Modesto Redevelopment Agency v. The Dow Chemical Co.,
No. 999643 (Feb. 14, 2007), where the court found "substantial
compliance" with the Polanco Act's notice requirements because
"the defendants suffered no loss or disadvantage from any of the
alleged deficiencies in the timing, content, or delivery of the
notices." Id. at 22.  The opinion does not specify what the
alleged deficiencies were or cite any authority for deeming
"substantial compliance" to be adequate under the Polanco Act.

     A more persuasive, albeit non-precedential, analysis of the
Polanco Act's notice requirements may be found in an unpublished
California Court of Appeal decision, Anaheim Redevelopment
Agency v. Union Pac. R.R. Co., No. G028913, 2003 WL 21310576
(Cal. Ct. App. June 9, 2003).  The Anaheim court held that a
redevelopment agency's failure to give a responsible party sixty
days' notice before conducting its own cleanup was fatal to its
Polanco Act claim.  Id. at *7; see also id. at *5 ("[A]n agency
that does not comply with the Act cannot claim its benefits.").

     The Anaheim court also rejected the second argument made by
the RAS here: that notice was not required because the agency
had determined that the site required immediate action.  Id. at
*7.  This is because the basis for the agency's determination in
Anaheim was not the existence of a "threat to health or safety
caused by leaving the site as is until the proper notifications
could be made," but rather the agency's determination "that its
own financial interests would be harmed by a delay in the
project." Id. at *6.  The court rejected the agency's broad
interpretation of § 33459.1(c)(2), finding that allowing an
agency to declare an immediate action requirement for reasons

other than a health and safety emergency "would create the exception that ate the rule." Id. at *7.  Moreover, the court found that interpreting the exception to apply only in health and safety emergencies is supported by the Act's legislative history.  Id. (citing Enrolled Bill Report, AB 3193).

Here, although the RAS did state in its October 24, 2004 letters that immediate action was necessary, it has produced no evidence that the contamination on Area 3 was a health or safety emergency.  Indeed, the senior hydrologist who created the RAS's workplan and managed its remediation of Area 3, Kurt Balasek, testified in his deposition that the urgency to complete the project stemmed from the economic consequences of delayed construction, not from an imminent threat to human health or the environment.

The RAS cites no contrary evidence, but simply asserts that the petroleum constituted an emergency situation "in light of the open pit excavation containing petroleum contamination emitted from Railroads' pipeline, threatening the groundwater supply."  This assertion does not create an issue of material fact.  Moreover, it is implausible that an additional sixty-day delay in cleaning up contamination released at least twenty years earlier would pose a significant additional risk.  In short, the Railroads have established with uncontroverted evidence that the petroleum on Area 3 did not constitute an environmental or public health emergency in the fall of 2004.

The court is persuaded that economic interests cannot justify a redevelopment agency's finding that immediate action is required, lest the exception swallow the rule.  "Conditions"

under California Health & Safety Code section 33459.1(c)(2)
refers only to environmental, health or safety conditions, not
to economic considerations.  The court finds that the RAS
violated the Polanco Act's sixty-day notice requirement, and
that "an agency that does not comply with the Act cannot claim
its benefits."[7]  Id. at *5.  Accordingly, the Railroads cannot be
held liable under the Polanco Act for the remediation of Area 3.

The remediation of Areas 4 and 24 is another matter.  In
late 2004 and early 2005, the RAS issued corrective action
notices to the Railroads regarding Areas 4 and 24.  To date, the
Railroads have not responded with corrective action plans.  The
RAS apparently has not cleaned up the alleged contamination on
Areas 4 and 24.  Thus, there would appear to be no similar
notice problems with respect to these areas.

Accordingly, the court holds that the Railroads are not
liable under the Polanco Act for the remediation of Area 3 but
are liable under the Act for the remediation of Areas 4 and 24.

### III. Tort Claims and Requests for Relief

The RAS also brings claims for nuisance, trespass,
injunctive relief/abatement of nuisance, unjust enrichment,
equitable indemnity, and declaratory relief.

---

[7] As the Railroads argue, the RAS also may have violated the
Polanco Act's requirements having to do with the procedure for
seeking and obtaining approval from state authorities before
commencing work.  Because the court finds that the RAS's failure
to provide sixty-day notice is sufficient to preclude recovery,
however, it does not reach these issues.  Nor, for the same
reason, does it reach the Railroads' arguments that the RAS's
costs from cleaning up Area 3 are not recoverable under the
Polanco Act because its remediation of Area 3 was unnecessary
and inconsistent with other state and federal laws.

A. <u>Nuisance</u>

Under California law, a nuisance is "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code § 3479.  As discussed briefly above, nuisance liability in California is both broad and strict.  "[A]ny person who creates or helps create and maintain a nuisance is liable for its abatement and damages." <u>California v. Campbell</u>, 138 F.3d 772, 782 (9th Cir. 1998) (citation omitted); <u>see</u> <u>Lincoln Props., Ltd. v. Higgins</u>, No. S-91-760-DFL-GGH, 1993 WL 217423, at *25 (E.D. Cal. Jan. 21, 1993).  "[N]uisance liability is strict, since the injury to the property itself gives rise to the liability, irrespective of the care or lack of care." <u>Lincoln Props.</u>, 1993 WL 217423, at *23 (quoting <u>Snow v. Marian Realty Co.</u>, 212 Cal. 622, 626 (1931)) (internal quotation marks omitted); <u>see</u> <u>County of Santa Clara v. Atl. Richfield Co.</u>, 137 Cal. App. 4th 292, 306 (2006) ("Liability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant *created or assisted in the creation of the nuisance.*") (citations and internal quotation marks omitted) (emphasis in original).

There is no question but that the presence of petroleum on the Property constitutes a nuisance.  And, as already discussed, the Railroads were a but-for cause of this nuisance because they participated in the design and approval of the substitute tracks' drainage, agreed to maintain the tracks and drainage,

22

and used the tracks (and, thus, the drainage) for nearly two decades.  Therefore, they are liable to the RAS for nuisance.

B. <u>Trespass</u>

The RSA also alleges that the petroleum's presence on the Property constitutes a trespass by the Railroads.  In <u>Newhall Land & Farming Co. v. Superior Court</u>, the California Court of Appeal held that a prior owner who tortiously leaves contamination on a property may be liable to the current owner for trespass.  19 Cal. App. 4th 332, 345 (1993).  Because "one whose action or inaction causes a public nuisance is considered a tortfeasor," <u>id.</u>, and the Railroads are liable for creating a public nuisance, they are also liable for trespass.

C. <u>Unjust Enrichment</u>

The RAS brings a claim for unjust enrichment.  But "[t]here is no cause of action in California for unjust enrichment." <u>Melchoir v. New Line Prods., Inc.</u>, 106 Cal. App. 4th 779, 793 (2003) (citation omitted).

D. <u>Equitable Indemnity, Declaratory Relief, and Injunctive Relief</u>

The RAS seeks equitable indemnity for the sums it has expended remediating Area 3 and a declaratory judgment holding that the Railroads are liable for remediating Areas 3, 4, and 24.  The RAS also brings a renewed motion for a preliminary injunction compelling the Railroads to assume responsibility for the remediation of Areas 4 and 24.

Because the court grants summary judgment for the RAS on its Polanco Act claims with respect to Areas 4 and 24, and for the Railroads with respect to Area 3, declaratory relief of the

scope requested is inappropriate.  Further, the court remains
unpersuaded that a preliminary injunction is in order.
Moreover, the precise terms of a permanent injunction concerning
areas 4 and 24 will require further briefing by the parties, now
that they have the court's rulings on so many of the pending
issues.

As for Area 3, the RAS asserts that the Railroads are
responsible for the entire cost of remediation.  The Railroads
assert that this cost would have been significantly lower if the
RAS had been concerned only with cleaning up petroleum.
According to the Railroads, the project was much more costly
because the RAS had to deal with other, more toxic contaminants
present in Area 3 – including lead, arsenic and PAHs – for which
the Railroads are not responsible or even alleged to be
responsible.  Thus, although the Railroads are liable for
creating a nuisance and trespassing on Area 3, the amount of the
RAS's damages are disputed and cannot be resolved on the
briefing and record now before the court.[8]

---

[8]  Once again the RAS attempts to introduce new factual issues
in its opposition. In the opposition to the Railroads' motion,
the RAS asserts for the first time that the Railroads are a
likely source of the PAHs.  In support, it points to the
deposition of its expert toxicologist, James Clark, who
testified that railroad ties likely are a major source of PAHs.
The RAS also points to the report of its expert, Doug Heard,
which states that railroad operations are potential sources of
contaminants found on the Property.
In reply, the Railroads point out that Clark offered no
opinions regarding PAHs in his expert reports, and that when the
Railroads asked the RAS in interrogatories to identify all facts
supporting its contention that the Railroads were responsible
for releasing hazardous substances on the Property, the RAS's
responses mentioned nothing about railroad ties or PAHs.  Nor

In further briefing or other proceedings, the parties must clarify how much, if any, of RAS's remediation expenses relating to Area 3 are attributable to the presence of contaminants other than the petroleum emitted by the french drain.

CONCLUSION

The court GRANTS summary judgment for the RAS on its Polanco Act liability claim with respect to Areas 4 and 24, and on its nuisance and trespass claims with respect to the entire Property.

The Railroads' motion for summary judgment is GRANTED on the Polanco Act claims with respect to Area 3, and GRANTED with respect to the unjust enrichment claim.

The court will set a status conference to schedule such further proceedings as may be necessary to resolve the remaining issues concerning injunctive relief and damages.

IT IS SO ORDERED.

Dated:  June 18, 2007

/s/ David F. Levi_____
DAVID F. LEVI
United States District Judge

---

did the RAS ever supplement its responses to include such contentions.  In these circumstances, the RAS may not now assert that the Railroad were responsible for PAH on the property.