UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THE REDEVELOPMENT AGENCY OF THE CITY OF STOCKTON, a public body, corporate and politic, | ) ) ) ) | Case No. 2:05-CV-02087 JAM-JFM **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| BURLINGTON NORTHERN AND SANTA FE RAILWAY CORPORATION, UNION PACIFIC RAILROAD COMPANY, and DOES 1 through 100, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |
| AND RELATED CROSS-ACTIONS. | ) | |
| _____ | ) | |

The above captioned action came on for trial before the Court from February 23 to February 26, 2009.  Pursuant to Federal Rule of Civil Procedure 52, the Court makes the following findings of facts and conclusions of law.

## **FINDINGS OF FACT**

### UNDISPUTED FACTS

1.   The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

2.   Areas 3, 4 and 24 (the "Property") consist of three

1

contiguous blocks in the City of Stockton, California ("City")
bounded to the north by Weber Avenue, to the south by Washington
Street, to the east by Van Buren Street, and to the west by Lincoln
Street.  Amended Pretrial Order, Undisputed Fact No. 19.  Area 24
is the northern most block and Area 4 is the southern most block.
Area 3 is between Areas 24 and 4.  *See* Ex. 214, Figure 1.

    3.   In 1968, the State of California proposed constructing
portions of Interstate Route 5 and State Route 4 that conflicted
with existing railroad tracks in Stockton.  Amended Pretrial Order,
Undisputed Fact No. 1.  The State therefore entered into an
agreement ("1968 Agreement") with the Railroads' predecessors,
Western Pacific, ATSF and Southern Pacific, to build substitute
railroad tracks at the State's expense.  Amended Pretrial Order,
Undisputed Fact Nos. 2, 22; Ex. 13.

    4.   Under the 1968 agreement, the Railroads agreed to
maintain the new tracks, roadbed and drainage.  The State agreed to
acquire and, by separate documents, to convey to the Railroads all
rights of way necessary for the construction and operation of the
substitute tracks.  Amended Pretrial Order, Undisputed Fact No. 3.

    5.   The State of California performed the grading work on the
Property, and installed an underground perforated drainage pipe, or
"french drain."  Amended Pretrial Order, Undisputed Fact No. 4.

    6.   After completion of the grading, the Railroads built the
substitute tracks at the State's expense.  The tracks were in use
from September 11, 1970 until 1988.  Amended Pretrial Order,
Undisputed Fact Nos. 6, 27.  The new tracks crossed Areas 24, 3 and
4 in the north-south direction, entering Area 24 in the northwest
corner, arcing to the south across Area 24, and then proceeding

2

south through the center of Areas 3 and 4.  *See* Ex. 214, Fig. 1.

7.   In 1983, the State conveyed title to the substitute tracks and underlying land to the Railroads.  Amended Pretrial Order, Undisputed Fact Nos. 7, 32, 33.

8.   In 1987, the Redevelopment Agency of the City of Stockton ("RAS" or the "Agency") entered into an agreement with Union Pacific, Southern Pacific, and ATSF to relocate the railroad tracks that crossed Areas 3, 4 and 24 ("1987 Agreement").  Amended Pretrial Order, Undisputed Fact Nos. 36-39; Ex. 38.  In 1988, pursuant to the 1987 Agreement, the Railroads transferred their interests in the Property to the RAS.  Amended Pretrial Order, Undisputed Fact Nos. 8, 38, 39.

9.   The 1987 Agreement provided in part that:  "AGENCY shall acquire and RAILROADS shall be relieved of any and all responsibility and liability for the removal of trackage and appurtenances on the property being transferred to AGENCY and for restoration of any surfaces."  Ex. 38 at 3, Section 3.

10.   On April 22, 2004, the RAS obtained a permit for the construction of the WorkNet Building on Area 3.  Ex. 48.  The permit required that a soil management plan be prepared prior to disturbing site soils because of the lead contamination.  Ex. 48 (Conditions of Approval No. 1); Ex. 50 at SRDA 183; Tr. 294:19-295:1.

11.   After the sale to Regent Weber, LLC ("Regent"), in July 2004, Regent began grading Area 3 for construction of the WorkNet building.  Ex. 174 at 1, BALASEK 000626.  At that time, Regent did not have a soil management plan for the site soils.  Tr. 172:24-173:16.  The top five to seven feet of soil in Area 3 was

3

unsuitable for use as geotechnical fill for the foundation of the building, and Regent therefore had to remove that soil before construction.  Ex. 93 at 6, SRDA 1332; Tr. 203:13-21; 217:18-218:4.

12.  During development on the Property in 2004, petroleum contamination was found in the soil of Area 3 along the path of the French drain, in the groundwater under Area 3, and elsewhere on the Property.  June 19, 2007 Order ("Order") at 3:14-17.

13.  The French drain served as a preferential pathway for the petroleum contamination, which would have taken a different course were it not for the drain.  Were it not for the French drain, the Property would not have become contaminated with petroleum.  Order at 3:17-22.

14.  Testing [in 2005], showed that the petroleum contamination was at least twenty years old.  Order at 4:1-2.

15.  Certain other contaminants, including lead, arsenic and hydrocarbons called PAHs, subsequently were also found on the Property.  Order at 4:2-4.

16.  The likely source of the petroleum contamination was the nearby L&M petroleum facility that ceased operations in 1982, and at which there were a number of spills in the early 1970s, including a spill of 3,000 to 6,000 gallons of diesel fuel in 1974. Order at 4:5-11.

17.  The Agency first sent corrective action notices to the Railroads requesting that they prepare remedial action plans for Area 3 on August 25, 2004.  Order 5:1-3.

18.  In late 2004 and early 2005, the Agency sent the Railroads similar notices about Areas 4 and 24.  Order at 5:5-6.

19.  The Railroads did not respond to any of the Agency's

4

1   notices prior to the filing of the Complaint in this action.   Order

2   5:6-7.

3       AREA 3

4       20.   Area 3 is the former City block bounded to the north by

5   the former Main Street, to the south by the former Market Street,

6   to the east by Van Buren Street, and to the west by Lincoln Street.

7   Ex. 214, Fig. 1.

8       21.   The RAS owned Area 3 from 1988 until June 15, 2004, when

9   it sold Area 3 to Regent.   Amended Pretrial Order, Undisputed Fact

10  No. 41.   Regent planned to build an office building known as

11  WorkNet on Area 3.   The terms of sale to Regent were set forth in a

12  Disposition and Development Agreement ("DDA") dated February 24,

13  2004.   Ex. 45.   One of the terms of the DDA was that the RAS would

14  indemnify Regent for costs incurred as a result of contamination

15  present on Area 3 as of the date of sale.   *Id*. at 27-29, SRDA 2508-

16  10.

17      22.   On March 15, 1999, the Agency sued the owners and

18  operators of nearby petroleum bulk storage plants, including the

19  L&M facility, and a paint manufacturing facility in Area 2A to the

20  west of Areas 3 and 24.   In the action, which was entitled *The*

21  *Redevelopment Agency of the City of Stockton v. Union Oil Company*

22  *of California*, San Mateo County Superior Court Case No. 410753, the

23  Agency sought damages for contamination of Area 2A and its vicinity

24  as a result of releases of fuels from the L&M facility, a Unocal

25  facility, and the Morton Paint Company.

26      23.   With respect to the properties immediately to the west of

27  Areas 3 and 24, the Agency obtained settlements with Alco

28  Industries, Inc. and Union Oil Company of California in which the

1    Agency was paid $2.6 million.

2        24.   Wallace-Kuhl ("WK"), who was working for Regent, was

3    doing a geotechnical investigation for foundation design on Area 3

4    and was on site observing excavation of material when contaminated

5    soil was encountered on July 16, 2004. (Tr. 128:20-129:10)

6        25.   A representative from WK's environmental group visited

7    the site and collected 4 initial soil samples which revealed that

8    the suspect soil was in fact contaminated with hydrocarbons. (Tr.

9    129:11-18)

10       26.   On July 23, 2004, Regent began excavating the petroleum

11   contaminated soil.  (Tr. 221:17-21, 347:1-10, 418:3-15)  The French

12   drain, a perforated 12" pipe, was discovered at approximately four

13   and one half feet below ground surface after a backhoe had been

14   brought in to investigate the extent of the contamination.  (Tr.

15   129:22-130:6, 202:14-203:1)

16       27.   On July 29, 2004, WK met with Regent and the Agency.  The

17   California Department of Toxic Substances Control ("DTSC") and

18   Regional Water Quality Control Board ("RWQCB" or "Regional Board")

19   were also notified in order to get a work plan in place to further

20   the excavation/investigation/remediation. (Tr. 130:23-131:12)

21       28.   WK submitted a work plan for further investigation to the

22   RWQCB on August 2, 2004.  Ex. 51.  At that time, WK estimated that

23   Regent would excavate an additional 2,500 cubic yards of petroleum

24   contaminated soil.  Ex. 51 at 1, SRDA 173.  WK submitted a Revised

25   Site Investigation Workplan to the RWQCB on September 14, 2004.

26   Ex. 71.  At that time, WK estimated that Regent would excavate an

27   additional 3,000 cubic yards of petroleum contaminated soil.  *Id*.

28   at 4, SRDA 348.  Ultimately, Regent excavated a total of 8,000

                                    6

1  cubic yards of soil.  Tr. 151:18-22.

2      29.  RWQCB staff approved the Revised Site Investigation

3  Workplan with conditions on September 24, 2004.  Ex. 78.  In a

4  letter to WK, RWQCB staff wrote that the cleanup goals for Area 3

5  would be "non-detect or background" concentrations, but did not

6  specify whether those cleanup goals would apply to soil or

7  groundwater.  *Id*. at 2, SRDA 365.  The approval letter also

8  directed the RAS to provide responses to the RWQCB's comments two

9  weeks before recommencing field work.  *Id*.

10     30.  Four days later, and without responding to the RWQCB,

11 Regent recommenced excavation of contaminated soil, and continued

12 to excavate from September 28, 2004 to October 11, 2004.  Ex. 108

13 at 7, SRDA 545; Exs. 84, 87, 88.  Regent excavated a trench 300

14 feet long, 18 to 20 feet deep and 15 to 20 feet wide at the bottom.

15 Ex. 84 at SRDA 499.  Regent segregated the petroleum impacted soil

16 that it excavated from the soil that was not contaminated with

17 petroleum.  Tr. 151:23-152:2, 162:11-21.  Some soil was

18 contaminated with both lead and petroleum.  Tr. 221:5-8.

19     31.  Diesel was found down to 16 feet and the groundwater was

20 approximately 18 feet.  With the fluctuations of groundwater

21 levels, it was "pretty clear" that groundwater quality was

22 threatened. (Tr. 45:4-9)

23     32.  Groundwater is approximately 15 to 20 feet below ground

24 surface. (Tr. 104:10-15)

25     33.  Groundwater quality was threatened and there was a high

26 likelihood that the groundwater would be impacted. (Tr. 45:13-15)

27     34.  The RWQCB found the plan submitted by WK to excavate the

28 soil containing petroleum to be reasonable. (Tr. 14:6-19)

35.   Regent did not excavate Area 3 to non-detectable concentrations, and in fact left some diesel contamination in the ground, which is now located beneath the completed WorkNet building.   Tr. 156:5-10, 158:12-20; Ex. 88 at 3-4, SRDA 496-97. Regent stopped excavating on the western wall of the excavation to avoid disturbing a building pad, because disturbing the pad would cause a "significant financial hardship."   Ex. 84 at SRDA 499; Ex. 108 at 8, SRDA 546.   Regent stopped excavating at the southern portion of the site when it encountered utilities and at the groundwater surface in the northern portion of the site.   *Id.*

36.   WK submitted a report regarding the soil excavation on March 28, 2005.   Ex. 108 (Wallace-Kuhl & Associates, *Report of Findings of Soil Excavation and Subsurface Soil and Groundwater Investigation*, March 28, 2005).   RWQCB staff commented on that report in a letter dated April 19, 2005 and requested a workplan to install borings and monitoring wells to delineate the lateral and vertical extent of contamination at Area 3.   Ex. 112 at 3, SRDA 608.

37.   The RAS, through WK, responded to the RWQCB's April 19, 2005 letter in a February 23, 2006 *Addendum to the Report of Findings of Soil Excavation and Subsurface Soil and Groundwater Investigation*.   In the *Addendum*, WK proposed to delay the installation of monitoring wells in Area 3 until an Environmental Oversight Agreement could be negotiated with DTSC for Areas 3, 4 and 24.   Ex. 121 at 9-10, RWQCB 001443-44.

38.   In March 2006, after the excavation and disposal of soil from Area 3 was completed, the RAS's litigation consultant, Golden State Environmental, Inc. ("GSE"), submitted a work plan to conduct

8

1   an investigation of Areas 3, 4 and 24.  Ex. 124.  RWQCB staff

2   responded to that work plan with comments in a letter dated June 7,

3   2006.  Ex. 125.  GSE, on behalf of the RAS, submitted a Revised

4   Work Plan for Soil and Groundwater Investigation on July 7, 2006.

5   Ex. 126.  As part of that work plan, GSE proposed to take soil,

6   soil vapor and "hydropunch" grab groundwater samples in Areas 3, 4

7   and 24.  Ex. 126 at 9, 16, 17, 20, SRDA 5655, 5662, 5663, 5666.

8   GSE also proposed to install groundwater monitoring wells if "the

9   results of the hydropunch sampling indicate that the groundwater

10  beneath the Site is impacted . . ." *Id*. at 21, SRDA 5667.

11       39.  GSE conducted the investigation described in the Revised

12  Work Plan in August 2006.  With respect to soil, GSE detected total

13  petroleum hydrocarbons as diesel in soil in Area 24, but not in

14  Areas 3 and 4.  Ex. 345, Figure 1 and Table 9, SRDA 7199, 7209-10.

15       40.  After the August 2006 investigation, GSE, on the RAS's

16  behalf, approached the RWQCB to request approval to install

17  monitoring wells on Area 3.  Ex. 128.  RWQCB staff, however,

18  indicated that based on the data that already existed they were

19  skeptical that monitoring wells would be required for Area 3.  Tr.

20  298:5-15 (Walker); *see also* Tr. 95:3-13 (Traylor).  The RAS has not

21  installed any monitoring wells on Areas 3, 4 or 24.  Tr. 159:14-20,

22  409:24-410:9.

23       41.  One of the issues in dispute in this case relates to

24  whether the Railroads are liable for the cost of disposing of soil

25  contaminated with lead.  The soil that Regent excavated that was

26  contaminated only with weathered diesel did not require disposal as

27  hazardous waste, and could be disposed at a Class 2 landfill.  Tr.

28  186:1-19.  Between October 15 and 27, 2004, Regent disposed of

1  approximately 4,980 cubic yards of soil by transporting it to

2  Forward Landfill in Manteca.  Ex. 108 at 13, SRDA 551.  Forward

3  Landfill is a Class 2, non-hazardous waste landfill.  *Id.*

4       42.  Excavated soil that was contaminated with lead at

5  sufficient concentrations, however, had to be disposed as hazardous

6  waste at a Class 1 landfill.  Tr. 186:1-23.  After the non-

7  hazardous waste soil was removed in October 2004, approximately

8  3,000 cubic yards of lead-contaminated soil was left on site for

9  later disposal.  Ex. 108 at 13, 15, SRDA 551, 553.  Ten months

10 later, from August 15 to 19, 2005, WK supervised the loading and

11 transport of the lead-contaminated soil to a Chemical Waste

12 Management Class 1 facility in Kettleman City for disposal as

13 hazardous waste.  Ex. 118 at 1-2, SRDA 1220-21.

14      43.  Other than a little overtime costs, there were no extra

15 costs incurred because of the speed of the cleanup. (Tr. 165:14:21)

16      44.  Because of the expedited nature of the project, the

17 cleanup costs were comparable to or less than what a "traditional"

18 cleanup would have been. (Tr. 166:6-10)

19      45.  In the fall of 2004, there was an open excavation pit and

20 with the rainy season approaching there was concern because

21 saturated or wet conditions are unsuitable for completing backfill.

22 (Tr. 167:9-19)  There were "serious concerns" about backfilling a

23 20 foot excavation given that it was going to be placed directly

24 under a building so the weather was absolutely a condition and

25 reason why the project was moved quickly. (Tr. 168:2-9)

26      46.  The RWQCB allowed the development of the building to go

27 forward on Area 3 even though there was remaining contamination

28 because the Agency and the RWQCB had an understanding that any

1  remaining issues would be addressed as part of the larger

2  characterization of Areas 4 and 24. (Tr. 255:9-20)

3      47.   The excavation of soil from Area 3 was conducted for

4  Regent, which was the owner of Area 3 after June 15, 2004.   Amended

5  Pretrial Order, Undisputed Fact No. 41; Tr. 191:10-192:20.   Because

6  the RAS believed that the DDA required it to indemnify Regent for

7  the costs associated with remediation of Area 3, the RAS signed a

8  promissory note and a First Implementation Agreement with Regent.

9  Exs. 74, 253; Tr. 263:23-264:10 (Pinkerton).   In the First

10  Implementation Agreement, the RAS confirmed its agreement to

11  indemnify Regent, appointed Regent as its agent with respect to the

12  remediation of Area 3, and agreed to make three annual payments to

13  Regent of costs that Regent advanced for the remediation of Area 3.

14  Ex. 74 at 2, 3, Sections 3, 4, 5, SRDA 1277-78.   The total

15  principal amount of those payments and of the promissory note was

16  $1,362,240.   Ex. 253; Tr. 260:23-24, 263:9-22.

17      48.   Pursuant to the First Implementation Agreement and the

18  promissory note, the RAS made three payments to Regent in 2005,

19  2006 and 2007 in the total principal amount of $1,362,240, plus

20  interest.  Tr. 245:4-12, 260:16-24, 263:9-22; Ex. 253.

21      49.   After examination and approval of the invoices Regent

22  submitted in accordance with First Implementation Agreement to the

23  Disposition and Development Agreement (Ex. 74, §5, SRDA 1278), the

24  Agency paid Regent Weber three roughly equal payments of $450,000.

25  (Tr. 279:2-280:8 and 284:11-19)

26      50.   The payments made by the Agency to Regent were based upon

27  money spent equivalent to the amount that was owed in the

28  promissory note. (Tr. 269:22-270-4)

1    51.   The Agency entered into a cost oversight agreement with

2   the RWQCB wherein Agency agreed to pay RWQCB's actual costs in

3   overseeing the investigation and cleanup on Area 3. (Tr. 11:4-17)

4        AREA 24

5        52.   Area 24 is the former City block bounded to the north by

6   Weber Avenue, to the south by the former Main Street, to the east

7   by Van Buren Street, and to the west by Lincoln Street.   Ex. 214,

8   Figure 1.

9        53.   The RAS is the current owner of Area 24.   Amended

10  Pretrial Order, Undisputed Fact No. 40.   The Children's Museum is

11  located on the eastern portion of Area 24.

12       54.   As described above, GSE conducted a soil and groundwater

13  investigation in Area 24 in August 2006. *See* Ex. 345.   GSE

14  detected gasoline and diesel contamination in soils in Area 24,

15  with the gasoline detected in the northwestern portion of Area 24.

16  Ex. 345, Figure 1 and Table 9, SRDA 7199, 7209-10.With respect to

17  water, GSE took samples from two trenches in Area 24.   Tr. 98:10-

18  99:11; Ex. 128, Table 2, RWQCB 003271; Ex. 345, Table 3, SRDA 7202.

19  Those samples were taken of water in the pea gravel immediately

20  beneath the drainage pipe.   Tr. 104:2-106:2.   Total petroleum

21  hydrocarbons as diesel were detected in both samples, indicating

22  that some diesel is present in the trench immediately below the

23  drainage pipe.   Ex. 128, Table 2, RWQCB 003271; Ex. 345, Table 3,

24  SRDA 7202.   As part of that same investigation, GSE also took seven

25  "hydropunch" grab groundwater samples in Areas 3, 4 and 24.

26  Analyses of those samples did not detect any total petroleum

27  hydrocarbons as diesel in groundwater.   Ex. 128 at Table 2, RWQCB

28  003271; Ex. 345, Table 3, SRDA 7202; Tr. 102:2-9.

1    55.   Trenching at Areas 4 and 24 confirmed the existence of

2  the French drain. (Tr. 316:12-15, 321:18-21)

3    56.   If petroleum hydrocarbons remain in the soil where the

4  French drain remains at Areas 24 and 4, such areas should be

5  investigated both laterally and vertically to the extent of

6  nondetect for the hydrocarbons. (Tr. 51:13-18, Ex. 216, section

7  3.1)

8    57.   The Railroads have not communicated with RWQCB regarding

9  Areas 24 or 4. (Tr. 25:17-19)

10    58.   The French drain is still present on Areas 24 and 4. (Tr.

11  59:9-21)

12    59.   At the request of the RWQCB, GSE, identified the location

13  of the French drain on Areas 4 and 24 because it was a direct

14  pathway to Area 3 from adjacent activities. (Tr. 66:3-6)

15    60.   GSE also conducted three separate investigations at the

16  Children's Museum in Area 24.  GSE conducted a soil investigation

17  in June 2006, a soil gas investigation in June 2007, and a follow-

18  up soil investigation in July 2007.  Ex. 343 at 1, 2, SRDA 6980,

19  6981.

20    61.   The initial soil investigation of the Children's Museum

21  in June 2006 was conducted outside the former railroad right of way

22  and found no petroleum contamination that required any remediation

23  or further investigation.  Ex. 343 at 8, SRDA 6987 (concentrations

24  are "low" and "do not pose a threat to workers at, or visitors to,

25  the Museum based on current land use").  However, GSE did find lead

26  contamination that required further investigation, which GSE

27  conducted during the follow-up soil investigation in July 2007.

28  Ex. 343 at 7, SRDA 6986.  The June 2007 soil gas investigation was

1  limited to analysis for TPHg (gasoline) and VOCs (volatile organic
2  compounds), and GSE did not test for diesel contamination.  Ex.
3  343, at 4, SRDA 6983.  The July 2007 follow-up soil investigation
4  was limited to lead and arsenic.  *Id*.

5      62.  The testimony regarding further work required at Area 24
6  was similar to the testimony regarding Area 3.  Mr. Heard and Ms.
7  Zemo testified that further investigation would be required.  Tr.
8  324:1-326:22, 439:4-6, 440:11-441:17, 442:20-443:12, 444:4-445:4.
9  Robert Traylor testified that the RWQCB would require removal of
10 the underground drainage pipe.  Tr. 69:16-70:5.  However, GSE's
11 prior dealings with the RWQCB suggest that the possible removal of
12 the drainage pipe will be handled in the same give-and-take manner
13 as the remainder of the investigation and cleanup.  The RWQCB's
14 June 7, 2006 comment letter to the RAS suggested that the RAS
15 remove the underground drainage pipe, but Mr. Traylor of GSE
16 responded on behalf of the RAS that further investigation was
17 necessary to determine a cost-effective remedial action.  Exs. 125,
18 126 at 4, SRDA 5640; Tr. 91:17-93:2.  None of GSE's work plans has
19 ever proposed removing the drainage pipe from Area 24 or Area 4.
20 Tr. 92:15-21.

21     63.  The RAS has never requested that the Regional Board
22 provide a no further action letter for Area 24.

23     64.  Petroleum hydrocarbons were found in the groundwater and
24 subsoils at Area 24. (Tr. 317:10-18)

25 AREA 4

26     65.  Area 4 is the former City block bounded to the north by
27 the former Market Street, to the south by Washington Street, to the
28 east by Van Buren Street, and to the west by Lincoln Street.  Ex.

14

1  214, Figure 1.

2      66.  The RAS is the current owner of Area 4.  Amended Pretrial

3  Order, Undisputed Fact No. 40.

4      67.  Although some diesel contamination was detected in soil

5  at the southern border of Area 3, no diesel contamination has been

6  detected in soil or groundwater in Area 4.  Ex. 214, Figs. 4A-4D

7  and 9B.

8      68.  Regarding whether further work is required with respect

9  to Area 4, Douglas Heard testified that, although remedial work

10  will probably not be required, further investigation will be

11  required.  Tr. 329:11-16, 358:25-360:20.  Dawn Zemo, the Railroads'

12  expert, testified that all that would be required to obtain closure

13  of Area 4 was the submission of a closure request.  Tr. 445:7-15,

14  458:10-459:19, 470:17-20.

15  <u>RAS's COSTS</u>

16      69.  The RAS paid several types of costs for the investigation

17  and remediation of Areas 3, 4 and 24.

18      70.  The RAS paid $1,363,240 to Regent for the cost of

19  remediation of Area 3.  Those costs were incurred because the RAS

20  believed it was obligated to indemnify Regent under the DDA.  Exs.

21  45, 74, 253; Tr. 263:23-264:10 (Pinkerton).  Thus, all of the RAS's

22  payments for cleanup costs were paid to reimburse Regent for costs

23  that Regent, the landowner, had incurred.

24      71.  Some of the costs that Regent incurred were incurred

25  because of the presence of lead on Area 3, not because of the

26  presence of petroleum contamination.  Regent incurred costs for the

27  disposal of lead-contaminated soil as Class I hazardous waste at

28  Chemical Waste Management in Kettleman Hills, California.  Regent

1   paid $273,299.10 to Denbeste Transportation, Inc. for these costs.

2   Exs. 131, 132, 133.

3        72.   Regent also incurred some costs for services of  WK that

4   were related to lead, and not petroleum.  The RAS seeks to recover

5   $444,283.00 based on WK's invoices for investigative/remedial work

6   at Area 3.  The invoices reference three different projects,

7   numbered and titled as follows:

8        • Project 5909.03:  Workplan Preparation, Soil

9          Excavation, & Additional Phase II Work, totaling

10         $398,709.08 (Exs. 139-49);

11       • Project 5909.04:  DTSC Regulatory Consultation and

12         Lead-Related Issues, totaling $23,052.00 (Exs. 152-

13         54); and

14       • Project 5909.09:  Soil/Waste Disposal, totaling

15         $22,521.49 (Ex. 150-51).

16       73.   Projects 5909.04 and 5909.09 were related to

17   consultations with DTSC related to lead in soil, and disposal of

18   lead-containing soils.  Thus, the total WK costs related to

19   petroleum are $398,709.08.

20       74.   In addition to the costs for which it reimbursed Regent,

21   the RAS seeks to recover $493,776.67 in investigative/remedial

22   costs associated with activities undertaken by GSE, at the Areas

23   between January 2005 and March 2008.  GSE acted as a litigation

24   consultant for the RAS's attorneys and billed all of its services

25   directly to these attorneys.  The GSE invoices submitted by the RAS

26   in support of this claim commingle the charges related to those two

27   roles.  GSE's litigation support was a small amount of the total

28   services provided to RAS.  The total cost for GSE's litigation

16

1  support was $10,686.25.  (Tr. 118:16-119:9; Ex. 333)

2      75.  Of the costs reflected in the GSE invoices, $181,010.40

3  of the total $493,776.67 are attributable to an investigation at

4  the Children's Museum, which is located on a parcel on the eastern

5  portion of Area 4 that is distinct from the parcel containing the

6  railroad right-of-way and drainage pipe.  *See* Railroads' Post-Trial

7  Brief, Attachment B.  There is no evidence that petroleum is a

8  concern at the Children's Museum.  The soil sampling work done as

9  part of GSE's investigation at the Children's Museum confirmed that

10  (a) metals – including arsenic and lead – are the constituents of

11  concern that pose a potential risk, and (b) petroleum "do[es] not

12  pose a threat to workers at, or visitors to, the Museum."  Ex. 343

13  at SRDA 6987-88 (Section 6 – Conclusions and Recommendations); Tr.

14  107:21-108:4, 109:1-110:11.

15      76.  Finally, the RAS incurred oversight costs charged by

16  regulatory agencies to supervise the environmental investigation

17  and remediation.  The RAS seeks to recover $63,233.09 in regulatory

18  oversight costs related to the Property, comprised of (a)

19  $25,661.36 in oversight charges by the RWQCB, and (b) $37,571.73 in

20  oversight charges by DTSC, including oversight of the Children's

21  Museum project.  DTSC's oversight was primarily focused on the

22  lead-related issues at Areas 3 and 24.  With respect to Area 3, the

23  City of Stockton entered into a Voluntary Cleanup Agreement with

24  DTSC on October 1, 2004.  Ex. 83.  The purpose of the VCA was to

25  address lead in site soils and to reimburse DTSC for its oversight

26  costs.  *Id*. at 2, SRDA 468.  The VCA specifically provided that the

27  "petroleum-related hydrocarbons . . . are being handled as part of

28  a separate evaluation being conducted by the City of Stockton under

17

1  the oversight of the RWQCB [Water Board]."  *Id*. at 3, SRDA 469.

2  The RAS also entered into a VCA with DTSC with respect to the

3  Children's Museum on Area 24.  Ex. 343 at 1, SRDA 6980.  As the

4  DTSC noted in its review of the RAS's investigation data from the

5  Children's Museum, "The issues concerning this site appear to be

6  arsenic and lead in soils."  Ex. 343, Appendix B, at SRDA 7032.

7  Ms. Cohen also testified that there was a separation of oversight

8  responsibility between the RWQCB, for petroleum contamination, and

9  DTSC, for lead contamination.  Tr. 21:25-22:9; 43:19-44:3.

10                          **CONCLUSIONS OF LAW**

11       1.   The Court has previously held, in the June 19, 2007

12  Order, that the Railroads are liable to the RAS in nuisance and

13  trespass with respect to Areas 3, 4 and 24, and under the Polanco

14  Redevelopment Act, California Health & Safety Code section 33459 *et*

15  *seq.*, with respect to Areas 4 and 24 only.  The Railroads are

16  liable for diesel petroleum contamination that was released on the

17  Areas by the underground drainage pipe.  The Court has also

18  previously held that the Railroads are not liable for lead, arsenic

19  or PAHs found on the Areas.

20       2.   The Agency has undertaken action to remedy and/or remove

21  a release of "hazardous substances," such action is continuing and

22  is not completed.

23       3.   The Agency has complied with the provisions of Health &

24  Safety Code section 33459.1(a) concerning notification to local

25  Health and Building Departments and the appropriate oversight

26  agencies, RWQCB and DTSC and obtained cleanup guidelines and

27  necessary approvals from all appropriate regulatory agencies.

28       4.   The Agency has incurred and is continuing to incur

                                  18

1   remedial or removal costs that have been reasonable and necessary

2   in order to investigate and address the contamination.

3       5.   The Agency was contractually obligated to reimburse

4   Regent the costs incurred to remedy the contamination on Area 3.

5       6.   The RAS seeks to recover $444,283.00 based on WK's

6   invoices for investigative/remedial work at Area 3.  Those invoices

7   are for three distinct projects:  Project 5909.03 (Workplan

8   Preparation, Soil Excavation, & Additional Phase II Work), totaling

9   $398,709.08;  Project 5909.04 (DTSC Regulatory Consultation and

10  Lead-Related Issues), totaling $23,052.00; and  Project 5909.09

11  (Soil/Waste Disposal), totaling $22,521.49.  The costs associated

12  with Projects 5909.04 and 5909.09 were incurred solely as a result

13  of the need to manage, transport, and dispose of lead-contaminated

14  soil at the site, for which the Railroads are not liable.  The

15  $45,573.49 in costs for Projects 5909.04 and 5909.09 are distinct

16  and divisible from any costs associated with diesel petroleum

17  contamination at the site, and the RAS is therefore not entitled to

18  recover these costs ($45,573.49).

19      7.   The RAS seeks to recover $273,299.10 paid on three

20  invoices dated September 10, 2005, from Denbeste Transportation,

21  Inc.:  Invoice #508436 (Truck Transportation), totaling

22  $263,812.50, Invoice #508585 (Loader w/Operator), totaling

23  $7,500.00; and Invoice #508160:  (Truck Transportation), totaling

24  $1,986.60, all of which reflect the costs associated with transport

25  and disposal of Area 3 soil and debris at a hazardous waste

26  disposal facility, due to the presence of lead at hazardous-waste

27  levels requiring Class 1 disposal.  All of these costs are distinct

28  and divisible from any costs associated with diesel petroleum

1  contamination at the site, and the RAS is not entitled to recover

2  this amount ($273,299.10).

3       8.   The RAS seeks to recover $645,657.90 in other costs,

4  including (1) approximately $522,000 in costs invoiced by JP Heintz

5  or by its subcontractors, and (2) approximately $118,000 for

6  importation and placement of clean fill material by Robert Burns

7  Construction.   The evidence submitted by the RAS to support this

8  claim does not distinguish between excavation, management, and

9  filling activities related to (a) lead contamination, (b) petroleum

10  contamination, and (c) geotechnical work that would have been

11  required, regardless of contamination (for example, importation and

12  grading of clean fill material to replace the top four to five feet

13  of soil containing rubble as the building's foundation).   Based on

14  the evidence, the Court concludes that a reasonable and equitable

15  apportionment of these costs, which also resolves in favor of the

16  RAS any uncertainty related to geotechnical work, may be made by

17  allocating these costs in the same ratio as the amount of soil from

18  Area 3 requiring Class 1 disposal due to lead contamination

19  (approximately 3,000 square yards) compared with the amount of soil

20  from Area 3 requiring Class 2 disposal due to petroleum

21  contamination (approximately 5,000 square yards), with no discount

22  to the Railroads for petroleum-contaminated soil that would have

23  been excavated in any event for geotechnical reasons.   This 3:5

24  ratio allocates 3/8 of the $645,657.90 to the RAS (totaling

25  $242,121.71), and 5/8 of the $645,657.90 to the Railroads (totaling

26  $403,536.19).

27       9.   The RAS seeks to recover $493,776.67 in

28  investigative/remedial costs associated with activities undertaken

1   by the RAS's contractor, GSE, at the Areas between January 2005 and

2   March 2008.   GSE also acted as a litigation consultant for the

3   RAS's attorneys and billed all of its services directly to these

4   attorneys.   The GSE invoices submitted by the RAS in support of

5   this claim commingle the charges related to those two roles, but

6   the Court finds that GSE's litigation consulting work was minimal

7   and amounted to $10,686.25 of GSE's total costs billed to RAS. Such

8   litigation support costs are not recoverable as damages.   Of the

9   $493,776.67 in costs reflected in the GSE invoices, $181,010.40 is

10  attributable to an investigation at the Children's Museum, which is

11  located on a parcel on the eastern portion of Area 4 that is

12  distinct from the parcel containing the railroad right-of-way and

13  drainage pipe.   There is no evidence that petroleum is a concern at

14  the Children's Museum.   As such, these costs are not recoverable by

15  the RAS.   Thus, of the $493,776.67 in GSE costs, the Court finds

16  that $302,080.02 are recoverable damages in this action.

17       10.   The RAS seeks to recover $63,233.09 in regulatory

18  oversight costs associated with its environmental

19  investigation/remediation at the Areas.   $25,661.36 in oversight

20  charges related to petroleum contamination issues were invoiced to

21  the RAS by the RWQCB, and $37,571.73 in oversight charges related

22  to lead contamination and the Childrens' Museum project were

23  invoiced to the RAS by the DTSC.   Because the Railroads are not

24  responsible for lead contamination at the Areas, and because there

25  is no evidence that petroleum contamination is an issue at the

26  Children's Museum parcel, it is reasonable and equitable to limit

27  the RAS to recovery of the $25,661.36 paid to the RWQCB.

28       11.   The RAS has received $2.975 million in prior settlements

21

1  to compensate it for contamination of Area 2A and its vicinity by

2  releases of petroleum.  This amount is comprised of $500,000 to

3  settle claims related to the L&M facility, and $2.475 million to

4  settle claims associated with the Union Oil/Unocal facility and the

5  Morton Paint/Alco facility.  The Railroads are not entitled to any

6  offset from these settlement funds, which were not received as

7  compensation for the same harm at issue in this action.

8      12.  The RAS is entitled to a preliminary and permanent

9  injunction requiring the Railroads to take action as follows:

10      The Railroads shall investigate and, if necessary,

11      remediate diesel petroleum contamination of soil and

12      groundwater at, under and emanating from Areas 3, 4 and

13      24 as to achieve Closure under the authority of and to

14      the satisfaction of the lead oversight agency, as

15      designated by the responsible environmental regulatory

16      agencies, including but not limited to the RWQCB, DTSC,

17      and any other federal, state or local governmental

18      agency (excluding the RAS) with jurisdiction over

19      remediation of the Site ("Lead Agency").  (The term

20      "Closure" shall mean the issuance of an official "no

21      further action" letter or other written communication of

22      equivalent form and effect from the Lead Agency which

23      confirms that all necessary investigation and

24      remediation of diesel petroleum contamination at, under

25      and emanating from Areas 3, 4 and 24 have been completed

26      based upon current commercial standards.)  To the extent

27      that removal of the drainage pipe located beneath Areas

28      4 and 24 is required, the RAS is required to remove it

1    at its own cost.  The Court shall retain jurisdiction.

2    The Railroads will report their progress in obtaining

3    Closure to the Court every six months until Closure is

4    obtained.

5        13.  Damages recoverable in continuing nuisance and continuing

6    trespass cases are limited to those damages incurred prior to

7    commencement of the action.  *Baker v. Burbank Glendale-Pasadena*

8    *Airport Authority*, 39 Cal.3d 862 (1985); Defendant's Reply Post

9    Trial Brief, Docket # 255 at pp. 8-11.  This is a case of

10   continuing – not permanent – nuisance and trespass.  The Agency

11   concedes this finding.  The evidence shows that of the $1,363,240

12   in remediation costs for Area 3 which the Agency incurred,

13   $489,110.32 (including interest) was paid by the Agency to Regent

14   prior to the Agency's commencement of this action on September 29,

15   2005.  As a matter of law, the Agency cannot recover under its

16   nuisance and trespass claims any costs incurred after September 29,

17   2005.  Accordingly, while the Agency is entitled to some recovery

18   associated with Area 3, the total amount of that recovery cannot

19   exceed $489,110.32.

20       14.  In light of the Court's rulings above, it is unnecessary

21   to consider the Railroad's counterclaims for equitable indemnity

22   and contribution.

23       15.  Based on the foregoing, the judgment in this action will

24   award $816,851.70[1] to the Agency on its claims, calculated as

25

26   [1] As set forth above, of the $1,363,240 sought by the Agency in
     this case the Court finds that the Agency would not be entitled
     to recover $45,573.49 of the $444,283 in costs paid to Wallace

27   Kuhl (Conclusion of Law #6), $273,299.10 paid to Denbeste
     Transportation (Conclusion of Law #7), and $242,121.71 of the

28   $645,657.90 paid to J. P. Heintz and Robert Burns Construction
     (Conclusion of Law #8).

follows:

```
     Area 3 costs (limited to costs incurred
     prior to September 29, 2005)              $ 489,110.32

     GSE costs                                 $ 302,080.02²

     Oversight costs (RWQCB costs only)        $  25,661.36

                                               $ 816,851.70
```

16.  Adjudication of the amount of attorneys' fees and statutory interest will be addressed by the Court at a future hearing following full briefing by the parties.


IT IS SO ORDERED.

DATED: June 30, 2009.

_____
JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE

---

² GSE costs that are awarded to the Agency are calculated as follows:

```
     $   493,776.87    Total costs
    -$    10,686.25    Litigation costs
     $   483,090.62
    -$   181,010.40    Children's Museum costs
     $   302,080.02
```