FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| REDEVELOPMENT AGENCY OF THE CITY OF STOCKTON, *Plaintiff-Appellee-Cross-Appellant,* v. BNSF RAILWAY COMPANY; UNION PACIFIC RAILROAD COMPANY, *Defendants-Appellants-Cross-Appellees.* | No. 09-16585 D.C. No. 2:05-cv-02087-JAM-JFM |
| REDEVELOPMENT AGENCY OF THE CITY OF STOCKTON, *Plaintiff-Appellee-Cross-Appellant,* v. BNSF RAILWAY COMPANY; UNION PACIFIC RAILROAD COMPANY, *Defendants-Appellants-Cross-Appellees.* | No. 09-16739 D.C. No. 2:05-cv-02087-JAM-JFM |
| REDEVELOPMENT AGENCY OF THE CITY OF STOCKTON, *Plaintiff-Appellee-Cross-Appellant,* v. BNSF RAILWAY COMPANY; UNION PACIFIC RAILROAD COMPANY, *Defendants-Appellants-Cross-Appellees.* | No. 09-17640 D.C. No. 2:05-cv-02087-JAM-JFM OPINION |

8733

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted
February 14, 2011—San Francisco, California

Filed June 28, 2011

Before: M. Margaret McKeown* and Richard C. Tallman,
Circuit Judges, and Arthur J. Tarnow,**
Senior District Judge.

Opinion by Judge Tallman

---

*Due to the death of the Honorable David R. Thompson, the Honorable M. Margaret McKeown, United States Circuit Judge for the Ninth Circuit, was drawn to replace him. Judge McKeown has read the briefs, reviewed the record, and listened to the audio recording of oral argument held on February 14, 2011.

**The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

Case: 09-16585    06/28/2011    Page: 3 of 20    ID: 7799651    DktEntry: 66-1
Case 2:05-cv-02087-JAM-JFM   Document 322   Filed 06/28/11   Page 3 of 20

8738        REDEVELOPMENT AGENCY v. BNSF RAILWAY

## COUNSEL

Morgan Gilhuly (argued), John F. Barg, Donald Sobelman, Barg Coffin Lewis & Trapp, LLP, San Francisco, California, for defendants-appellants-cross-appellees BNSF Railway Company and Union Pacific Railroad Company.

William D. Brown (argued), Scott E. Patterson, Christine J. Gracco, Brown & Winters, Cardiff-by-the-Sea, California, for plaintiff-appellee-cross-appellant Redevelopment Agency of the City of Stockton.

Kevin M. Fong, Margaret Rosegay, Pilsbury Winthrop Shaw Pittman LLP, San Francisco, California, for amicus curiae California Council for Environmental and Economic Balance.

Benjamin G. Shatz, Fred L. Main, Manatt, Phelps & Phillips, LLP, Los Angeles, California, for amicus curiae California Chamber of Commerce.

## OPINION

TALLMAN, Circuit Judge:

Appellants BNSF Railway Company and Union Pacific Railroad Company ("the Railroads") formerly maintained railroad tracks on a parcel of land in Stockton, California, that was contaminated by petroleum. The petroleum was spilled at a nearby industrial site and migrated onto the property via an underground french drain the Railroads had installed in order to remove water from the roadbed. We consider whether the Railroads are liable for the contamination of the property under the law of nuisance or under California's Polanco Redevelopment Act ("Polanco Act"), Cal. Health & Safety Code § 33459 *et. seq.* We hold that they are not.

Case 2:05-cv-02087-JAM-JFM   Document 322   Filed 06/28/11   Page 4 of 20

REDEVELOPMENT AGENCY v. BNSF RAILWAY            8739

There is no evidence that the Railroads actively or knowingly caused or permitted the contamination as required for nuisance liability and liability under the Polanco Act's Water Code provision. Nor were the Railroads "owners" of the property under the Polanco Act's CERCLA provision when the contamination occurred. Because the record establishes no genuine issue of material fact as to the Railroads' liability, the Railroads are entitled to summary judgment. Therefore, we need not reach any of the damages issues on appeal or cross-appeal.

# I

In 1968, in order to make room for the construction of a freeway interchange between Interstate 5 and State Highway 4 in Stockton, California, the State of California entered into a contract ("the Agreement") with several railroad companies, predecessors-in-interest to the Railroads, to relocate existing railroad track from the proposed interchange site to a nearby State-owned parcel ("the Property"). Under the Agreement, the Railroads planned and approved grading and drainage improvements to the Property made by the State, including the installation of a "french drain" underneath the new roadbed. The french drain, a buried perforated pipe, was designed to improve soil stability by facilitating drainage. After these improvements were completed, the Railroads laid track on the Property. The Railroads agreed to maintain the track, roadbed and drainage, and the State agreed to convey to the Railroads all rights-of-way necessary for track operation. Although the Railroads began running trains over the track in 1970, the State did not actually transfer the deed to the underlying land to the Railroads until 1983.

In 1988, the Railroads sold their interest in the Property to Appellee, the Redevelopment Agency of the City of Stockton ("the Agency"), which planned to develop the site. In 2004, the Agency sold a portion of the Property known as "Area 3" to a commercial developer (while retaining those portions

Case: 09-16585   06/28/2011   Page: 5 of 20   ID: 7799651   DktEntry: 66-1
Case 2:05-cv-02087-JAM-JFM   Document 322   Filed 06/28/11   Page 5 of 20

8740        REDEVELOPMENT AGENCY v. BNSF RAILWAY

known as "Area 4" and "Area 24") and indemnified the developer for costs incurred due to any then-existing contamination discovered on the site. When site excavation began in preparation for development, petroleum contamination was found in the soil along the path of the french drain and in the groundwater. Testing indicated that the contamination was at least twenty years old, and its likely source was determined to be the nearby L&M bulk petroleum facility ("the L&M Site") where there had been several spills in the early 1970s, including a spill of up to 6,000 gallons of diesel fuel in 1974. It is undisputed that the french drain served as a preferential pathway through which the petroleum contamination migrated underground onto the Property.

After the contamination was discovered in July 2004, the developer and the Agency began to work with environmental consultants and regulators to develop a remediation workplan for Area 3. The Agency sent notices to the Railroads requesting that they prepare remedial action plans for Areas 3, 4, and 24, but the Railroads did not respond to any of them. In the fall of 2004, a trench approximately 300 feet long, 18 to 20 feet deep, and 15 to 20 feet wide was excavated on Area 3 to remove contaminated soil. The Agency incurred costs of over $1.3 million for this work, plus additional costs of nearly one-half million dollars for investigation and remediation work on Areas 4 and 24 between 2005 and 2008.

On September 29, 2005, the Agency sued the Railroads in California Superior Court, seeking cost recovery and an injunction requiring the Railroads to remediate any remaining contamination at the Property. The Agency alleged that the Railroads were liable for the contamination under the Polanco Redevelopment Act as well as the common law of nuisance. The Railroads removed the action to the United States District Court for the Eastern District of California under diversity jurisdiction. The Railroads and the Agency filed cross-motions for summary judgment. On June 19, 2007, the district court ruled that the Railroads were liable for the contamina-

REDEVELOPMENT AGENCY v. BNSF RAILWAY            8741

tion under the law of nuisance and under the Polanco Act's Water Code provision,[1] but not under the Polanco Act's CERCLA provision. *See* Cal. Health & Safety Code § 33459(h). The Agency was awarded over eight hundred thousand dollars in damages and an injunction. The parties appeal and cross-appeal as to the findings of liability and the damages award.

## II

We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's ruling on cross-motions for summary judgment. *Trunk v. City of San Diego*, 629 F.3d 1099, 1105 (9th Cir. 2011). We view the evidence in the light most favorable to the nonmoving party and determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (citation omitted). When the district court disposes of a case on cross-motions for summary judgment, we may review both the grant of the prevailing party's motion and the corresponding denial of the opponent's motion. *Id.*; *see Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 694 n.2 (9th Cir. 1992).

## III

California law defines a nuisance, in part, as "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ." Cal. Civ. Code § 3479. To qualify as a nuisance "the interference must be both *substantial* and *unreasonable*." *People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1105 (1997) (emphasis in original); *see also San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 938-39 (1996). It is undis-

---

[1]The district court held that the Railroads were liable under the Polanco Act only for Areas 4 and 24, but not Area 3, because the Agency had failed to comply with the Act's notice provisions as to Area 3.

8742         REDEVELOPMENT AGENCY v. BNSF RAILWAY

puted that the soil and groundwater contamination in this case constitutes a nuisance. *See California v. Campbell*, 138 F.3d 772, 776 (9th Cir. 1998) (citing *Carter v. Chotiner*, 210 Cal. 288, 291 (1930)); *Selma Pressure Treating Co. v. Osmose Wood Preserving Co. of Am.*, 221 Cal. App. 3d 1601, 1619 (1990). The question is whether the Railroads are liable for it.

At the outset, we clarify how the concept of "unreasonableness" plays into nuisance liability. The Railroads invoke *Lussier v. San Lorenzo Valley Water District*, 206 Cal. App. 3d 92 (1988), for the proposition that nuisance liability requires an unreasonable act. *See id.* at 101 (noting that nuisance liability can arise "only for such interferences as are intentional and unreasonable or result from negligent, reckless or abnormally dangerous conduct" (internal quotation marks and citation omitted)). However, this proposition confuses the concept of an unreasonable *interference*, which is required for nuisance liability, with an unreasonable or negligent *act*, which is not. An intentional but not unreasonable *act* can give rise to nuisance liability if it creates an unreasonable *interference*. *See id.* at 105-06; *Shields v. Wondries*, 154 Cal. App. 2d 249, 255 (1957) (noting that a private nuisance may result from "skillfully directed efforts," such as the non-negligent construction of improvements on one's property, which nonetheless infringe upon a neighbor's property rights).

If the Railroads created or assisted in the creation of the nuisance on the Property by installing and maintaining the french drain, they are liable, regardless of whether the installation and maintenance of the french drain was conducted in a reasonable manner or not. If the Railroads did not create or assist in the creation of the nuisance, they can only be held liable if they acted unreasonably as possessors of the Property in failing to discover and abate the nuisance. *See Lussier*, 206 Cal. App. 3d at 104-05 (noting the general view that "proof of negligence may be essential to a claim of nuisance where the alleged nuisance involves a failure to act"). We consider first whether the Railroads created the nuisance by installing

the french drain; and second whether they unreasonably failed to discover and abate it.

### A

**[1]** Nuisance liability does not necessarily "hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant *created or assisted in the creation of the nuisance*." *Cnty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 306 (2006) (emphasis in original) (internal quotation marks and citations omitted). The district court concluded that the Railroads "created or assisted in the creation" of the nuisance because they were a but-for cause of the contamination of the Property: the contamination would not have migrated onto the Property but for the existence of the french drain, and the french drain would not have been installed but for the Railroads.

**[2]** We cannot agree that such passive but-for causation is sufficient for nuisance liability to attach. Under California law, conduct cannot be said to "create" a nuisance unless it more actively or knowingly generates or permits the specific nuisance condition. For example, in *Selma Pressure Treating Co.*, the California Court of Appeal held that a company's "direct involvement in the design and installation of unsafe disposal systems" for chemicals used in a wood treatment process, "coupled with its claimed knowledge of the dangers involved in such practices, clearly could support liability based upon a finding that it created or assisted in the creation of a public nuisance." 221 Cal. App. 3d at 1620.

However, in *City of Modesto Redevelopment Agency v. Superior Court*, 119 Cal. App. 4th 28 (2004), the Court of Appeal declined to extend *Selma* to hold that "those who merely placed [hazardous substances] in the stream of commerce," as opposed to those who "took affirmative steps directed toward the improper discharge of [hazardous]

wastes," could be liable for nuisance. *Id.* at 43; *see also Atl. Richfield*, 137 Cal. App. 4th at 310 (holding that lead paint manufacturers could incur nuisance liability for their "intentional promotion of the use of lead paint on the interiors of buildings with knowledge of the public health hazard that this would create," but not for their "mere manufacture and distribution of lead paint or their failure to warn of its hazards").[2]

Federal cases interpreting California nuisance law reflect this same understanding. *See Campbell*, 138 F.3d at 775 (defendant manufacturers created a nuisance at a property where they disposed of hazardous waste by dumping it on the ground); *W. Coast Home Builders, Inc. v. Aventis Cropscience USA Inc.*, 2009 WL 2612380 at *9 (N.D. Cal. 2009) (defendant waste generators not liable for groundwater contamination at a landfill where their waste was disposed because their conduct was "too attenuated from the creation of the alleged nuisance," even though it was a but-for cause of the contamination).

**[3]** In short, we find no precedent suggesting that but-for causation suffices for nuisance liability, and we will not adopt such an expansive interpretation of California law here. Because the Railroads' conduct with regard to the specific nuisance condition—the contamination—was not active, affirmative, or knowing, the Railroads simply did not "create or assist in the creation" of the nuisance on the Property. They did not spill the petroleum or otherwise release it into the environment. They did not affirmatively direct its flow or

---

[2]As the Agency points out, the holdings in *Modesto* and *Atlantic Richfield* are explained in part by the courts' recognition that manufacturing and distribution activity may be better addressed through the law of products liability. *See Atl. Richfield*, 137 Cal. App. 4th at 308-09. But these cases are also explained by the courts' recognition that nuisance liability requires more than a passive or attenuated causal connection to contamination. *See id.* at 309-10 ("A public nuisance cause of action is not premised on a defect in a product or a failure to warn but on affirmative conduct that assisted in the creation of a hazardous condition.").

knowingly permit it to migrate into the french drain and onto the Property. While the Railroads may have acted affirmatively with regard to the installation of the french drain, that conduct was wholly unrelated to the contamination. The Railroads did not, for example, install the french drain as part of a system designed to move or dispose of hazardous waste, like the defendants did in *Selma*. *See* 221 Cal. App. 3d at 1620. The drainage improvements on the site were designed to move water, not contaminants.

**[4]** We decline to hold that an otherwise innocent party who builds or installs a conduit or structure for an unrelated purpose which happens to affect the distribution of contamination released by someone else is nonetheless liable for "creating or assisting in the creation" of a nuisance. Such a result defies semantics, the law, and common sense. "While liability for nuisance is broad . . . , it is not unlimited." *Modesto*, 119 Cal. App. 4th at 39. We decline to extend it here. The Railroads are not liable for creating a nuisance by virtue of their installation of the french drain.

**B**

**[5]** We must also examine whether the Railroads are liable for nuisance as the possessors of the Property when the contamination occurred. Possessors of land can be liable for a nuisance on that land even when they did not create the nuisance. *See Leslie Salt Co. v. San Francisco Bay Conservation and Dev. Comm'n*, 153 Cal. App. 3d 605, 619-20 (1984) (noting that, under principles of nuisance, an occupier of land could be liable for fill dumped into a wetland by someone else without the occupier's knowledge). In such a situation, liability flows not from the possessor's "active responsibility for a condition of his land that causes widespread harm . . . but rather, and quite simply, from his very possession and control of the land in question." *Id.* at 622; *see also* Restatement (Second) of Torts § 839 cmt. d (1979). California nuisance law conforms to the Restatement, *see City of Los Angeles v. San*

*Pedro Boat Works*, 635 F.3d 440, 452 (9th Cir. 2011), and under the Restatement,

> [a] possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and
>
> (a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and
>
> (b) he knows or should know that it exists without the consent of those affected by it, and
>
> (c) he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it.

Restatement (Second) of Torts § 839 (1979).

We assume, without deciding, that the soil and groundwater contamination on the Property is considered "abatable" under California law. *See Capogeannis v. Superior Court*, 12 Cal. App. 4th 668, 682-83 (1993) (holding that soil and groundwater contamination can be considered abatable); *but see Mangini v. Aerojet-Gen. Corp.*, 12 Cal. 4th 1087, 1099-1100 (1996) (noting that " 'abatable' means reasonably abatable" given considerations of cost and practicality); Restatement (Second) of Torts § 839 cmt. f (1979). We focus instead on whether the Railroads knew or should have known of the contamination.

**[6]** No evidence has been adduced that the Railroads had actual knowledge of the contamination while they were in possession of the Property. Whether the Railroads "should have known" about the contamination depends on whether they had a duty to inspect for it and whether it was discover-

able by a reasonable inspection. *See Leslie Salt*, 153 Cal. App. 3d at 621; Restatement (Second) of Torts § 839 cmt. i (1979). The Agency does not allege that the contamination should have been apparent to the Railroads based on their periodic visual inspections of the Property. This is not a case in which, for example, the nuisance was in any way manifest on the surface of the land. *Cf. Leslie Salt*, 153 Cal. App. 3d at 621 (holding that landowner "certainly" should have known of "the existence of several hundred tons of detritus and other fill materials on its land"). Indeed, the contamination was not discovered by any subsequent owner or possessor of the land, including the Agency itself, until excavation began at the Property some sixteen years after the Railroads sold it.

[7] The Agency nonetheless implies that the Railroads had a duty to inspect the *subsurface* for contamination, because: (1) the Property was near the L&M Site, a potential source of hazardous waste; and (2) the Railroads were obligated by the Agreement to maintain the railroad tracks and drainage. Neither of these conditions is sufficient to establish such a duty. As to the first, it is untenable that a possessor of land, simply because his neighbor is a potential polluter, thereby becomes responsible for investigating the subsurface in order to discover and control his neighbor's pollution. Such a holding shifts too much of the cost of pollution control away from the parties who actually have the ability to affect whether a hazardous substance is released into the environment in the first place, and onto the innocent parties who have the misfortune of being "downstream."

[8] The law reasonably imposes a duty on a possessor of land to ensure that activities on that land—where the possessor has control—do not produce a nuisance. *See Leslie Salt*, 153 Cal. App. 3d at 620-22; Restatement (Second) of Torts § 838 (1979). This is not the same as a duty to ensure that activities on adjacent land—where the possessor has *no* control—do not produce a nuisance. It is this latter duty that the Agency essentially asks us to impose on the Railroads,

and we decline to do so. The law of nuisance evolved to protect a person from his neighbor's activities, not to render him liable for them. *See Lussier*, 206 Cal. App. 3d at 100 ("The basic concept underlying the law of nuisances is articulated in the ancient maxim *sic utere tuo ut alienum non laedas*, that is, so use your own as not to injure another's property." (citations omitted)).

**[9]** Whether the Railroads had a duty to inspect the subsurface for contamination of the Property based on their responsibility under the Agreement to "maintain" the track and drainage is a closer question. We recently suggested in dicta that a possessor of land who was contractually obligated to " 'keep and maintain [the] premises in a safe, clean, wholesome, sanitary and sightly condition' " might have a heightened duty to investigate for contamination. *San Pedro Boat Works*, 635 F.3d at 453. However, even assuming that this dicta should be applied as a rule of law, the Agreement simply cannot be construed to impose any comparable obligation on the Railroads. Unlike the contractual language in *San Pedro Boat Works*, the relevant language in the Agreement, which indicates that "the maintenance of all railroad facilities including track, roadbed, [and] railroad drainage . . . shall be by [the] Railroads at their expense," in no way implies any particular obligation to keep the Property pollution-free. Rather, this language merely imposes a duty to maintain certain structures on the Property. There is no indication that the Railroads did not fulfill this responsibility with regard to the drainage: as the Railroads point out, the drainage functioned exactly as it was supposed to by channeling and dispersing water under the site. Nothing in the Agreement remotely suggests that the "maintenance" of the railroad facilities involved a duty to conduct a proactive subsurface investigation for contamination.

**[10]** Because there is no basis on which to conclude that the Railroads knew or should have known of the contamina-

REDEVELOPMENT AGENCY v. BNSF RAILWAY        8749

tion, they cannot be liable for nuisance by virtue of their status as possessors of the Property.

IV

**[11]** In addition to its claim of nuisance, the Agency also claims that the Railroads are liable under California's Polanco Act, Cal. Health & Safety Code § 33459 *et. seq*. Under the Polanco Act, a local redevelopment agency can recover the costs it incurs for contamination remediation within a redevelopment project area from any "responsible party." *Id.* § 33459.4(a); *Modesto*, 119 Cal. App. 4th at 34. The Polanco Act defines a "responsible party" as any person described in either: (1) California Health and Safety Code section 25323.5 (which, in turn, refers to persons described in the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) at 42 U.S.C. § 9607(a)); or (2) California Water Code section 13304(a). Cal. Health & Safety Code § 33459(h). We now assess the Railroads' Polanco Act liability under both the Water Code provision and the CERCLA provision.

A

The Polanco Act imposes liability on parties described in section 13304(a) of the California Water Code, which in turn refers to

> [a]ny person . . . who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited   where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance . . . .

Cal. Water Code § 13304(a). The district court held that the Railroads were liable under section 13304 because the channeling and emission of petroleum by the french drain was a

discharge, and the Railroads were responsible for the design, installation and maintenance of the french drain. We disagree.

First of all, we take issue with the characterization of the emission of the contamination from the french drain as the relevant "discharge," when the french drain merely acted as a conduit for the waste that had been initially released into the environment at the L&M Site. *Cf. Lake Madrone Water Dist. v. State Water Res. Control Bd.*, 209 Cal. App. 3d 163, 169 (1989) (noting that a dam that collected and discharged silt was "not a mere conduit through which a [hazardous substance] passes"). It is undisputed that the Railroads did not in any way cause or permit the initial discharge of petroleum at the L&M Site. But even if the emission of contamination from the french drain is the appropriate "discharge" to consider, the Railroads are not liable.

**[12]** As the district court recognized, section 13304 should be construed harmoniously with the law of nuisance. *See Modesto*, 119 Cal. App. 4th at 37-38. However, because the district court construed nuisance liability too broadly its section 13304 liability analysis reflects the same error. Just as but-for causation is insufficient to impose liability for a nuisance, it is insufficient to impose liability for a discharge under section 13304. The California Court of Appeal has concluded that the words "causes or permits" within section 13304 were not intended "to encompass those whose involvement with a spill was remote and passive." *Modesto*, 119 Cal. App. at 44; *see also id.* at 43 ("[T]hose who took affirmative steps directed toward the improper discharge of [hazardous] wastes . . . may be liable under [section 13304]. . . ."). The Railroads' involvement with the petroleum *spill* was not only remote, it was nonexistent; and their involvement with the emission of contamination from the french drain was entirely passive and unknowing. As explained in our nuisance analysis, the Railroads engaged in no active, affirmative or knowing conduct with regard to the passage of contamination through the french drain and into the soil. Therefore, the Rail-

roads did not "cause or permit" the discharge under section 13304, and they are not liable under the Water Code provision of the Polanco Act.

**B**

**[13]** The Polanco Act also imposes liability on persons described in CERCLA at 42 U.S.C. § 9607(a). Cal. Health & Safety Code § 33459(h). As relevant to this case, CERCLA refers to "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). The district court held that the Railroads were not liable under the Polanco Act's CERCLA provision because they were not "owners" or "operators" within the meaning of CERCLA. The Agency has appealed only the district court's ruling that the Railroads were not "owners" of the Property. We agree with the district court on this issue.[3]

It is undisputed that the Agency did not deed the Property to the Railroads until 1983, well after the petroleum release occurred in the 1970s. However, the Agency asserts that the Railroads were nonetheless "owners" of the Property within the meaning of CERCLA when the petroleum release occurred because: (1) the doctrine of equitable conversion rendered them equitable owners of the Property upon the exe-

---

[3]We note that, prior to reaching the ownership issue, the district court determined that the migration of petroleum contamination onto the Property through the french drain constituted a "disposal" within the meaning of CERCLA at 42 U.S.C. § 9607(a)(2). We are skeptical of this aspect of the district court's ruling. *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 879 (9th Cir. 2001) (en banc) (holding that "the gradual passive migration of contamination through the soil" was not a "disposal" under CERCLA). However, because the "disposal" issue was not contested by the parties, and because we can affirm the district court's holding that the Railroads were not liable under the Polanco Act's CERCLA provision based on its finding that the Railroads were not "owners" of the Property, we decline to rule on the "disposal" issue.

8752        REDEVELOPMENT AGENCY v. BNSF RAILWAY

cution of the Agreement in 1968; or (2) they held an easement or license to operate trains over the Property pursuant to the Agreement. Both arguments fail.

1

The doctrine of equitable conversion generally provides that when a valid executory land sales contract is entered into, the purchaser becomes the equitable owner of the land. *See Parr-Richmond Indus. Corp. v. Boyd*, 43 Cal. 2d 157, 166 (1954) ("An unconditional contract for the sale of land, of which specific performance would be decreed, grants the purchaser equitable title, and equity considers him the owner."); *Alhambra Redevelopment Agency v. Transamerica Fin. Servs.*, 212 Cal. App. 3d 1370, 1376 (1989) ("By the execution of a valid enforceable contract to sell real estate the vendee becomes the equitable owner of the title . . . ." (internal quotation marks and citation omitted)). We must therefore inquire whether the Agreement functioned as a valid land sales contract. An essential requirement for a valid land sales contract is that it contain a description of the land to be conveyed. *See Corona Unified Sch. Dist. of Riverside Cnty. v. Vejar*, 165 Cal. App. 2d 561, 564-66 (1958). That description must be sufficient to delineate the property on the ground without resort to parol evidence. *Id.* at 566.

[14] The Agreement provided that the State would convey to the Railroads "all rights of way necessary for the construction and operation of substitute trackage . . . and for the construction and operation of all other railroad facilities required to be relocated or reestablished due to construction and relocation work herein contemplated." However, nowhere did the Agreement describe how wide or extensive these rights-of-way would be. Although a map was incorporated into the Agreement as "Exhibit A," that map, by its terms, depicted the location of the "trackage," not the extent of the associated rights-of-way. Furthermore, there is no indication from the Agreement that the State intended to convey a fee simple

REDEVELOPMENT AGENCY v. BNSF RAILWAY             8753

interest to the Railroads. After all, a "right-of-way" is commonly defined as a lesser property interest. *See* Black's Law Dictionary 1440 (9th ed. 2009) (defining a "right-of-way" as "[t]he right to build and operate a railway line or a highway *on land belonging to another*, or the land so used") (emphasis added).

**[15]** The Agreement simply did not describe the extent of the property to be transferred from the State to the Railroads sufficiently to be considered a valid land sales contract. *See Corona Unified*, 165 Cal. App. 2d at 566 (noting that " 'a strip of land in front of Golden Rule Store and Stent Market' " was an insufficient description of land because "nothing [was] contained as to the width or length of the strip" (citation omitted)). Therefore, the Agreement's execution did not establish the Railroads as equitable owners of the Property, and the Railroads are not CERCLA "owners" under this theory.

2

**[16]** The Agency also theorizes that the Railroads were "owners" of the Property for purposes of CERCLA because their construction and use of the track on the Property, as licensed by the Agreement, gave them an easement. *See Noronha v. Stewart*, 199 Cal. App. 3d 485, 490 (1988) ("[W]here a party has made substantial expenditures in reliance on a license, the license acts, for all purposes, as an easement, estopping the grantor and his successor from revoking it."). However, even assuming the Railroads held an easement over the Property, the argument that their status as an easement holder is enough to render them "owners" under CERCLA is squarely foreclosed by our precedent. "Having an easement does not make one an 'owner' for purposes of CERCLA liability." *Long Beach Unified Sch. Dist. v. Godwin Cal. Living Trust*, 32 F.3d 1364, 1370 (9th Cir. 1994); *see also id.* at 1368 ("[W]e read [CERCLA] as incorporating the common law definition of its terms . . . . The common law does not regard an easement holder as the owner of the property bur-

dened by it."); *San Pedro Boat Works*, 635 F.3d at 451 ("In establishing 'owner' liability [under CERCLA], Congress did not say 'de facto owner,' or 'possessor,' or 'person with some incidents or attributes of ownership,' as it has in other legislation. . . . Instead it used the unmodified term 'owner' which . . . when used alone, imports an absolute owner." (some internal quotation marks and citations omitted)).

In *Long Beach* we held that a holder of an easement for a non-polluting pipeline was not liable as an "owner" under CERCLA. 32 F.3d at 1368-69. The Agency points out, correctly, that *Long Beach* does not preclude imposing CERCLA liability on an easement holder when the contamination results from the use of the easement. *See id.* at 1367. But that is simply because, in such circumstances, the easement holder could be liable as an *operator* under CERCLA. *Id.* ("[W]hen a party uses the easement to operate a pipeline that releases hazardous materials, it is liable as an operator provided the other statutory elements [of CERCLA] are satisfied."). Certainly, if the Railroads' use of their right-of-way resulted in a contaminant release, the Railroads could be liable as "operators." But that is not what happened here. The petroleum spill was entirely unrelated to the Railroads' use of the easement, and the french drain was not installed or operated for any purpose related to the petroleum contamination.

The district court correctly held (and the Agency does not contest on appeal) that the Railroads were *not* "operators" under CERCLA because they did not "manage, direct, or conduct operations specifically related to [the] pollution, that is, operations having to do with the leakage or disposal of [the] hazardous waste." *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998). And there is absolutely nothing in our opinion in *Long Beach* that suggests that, if the Railroads are not liable as "operators," they can nonetheless be liable as "owners" based solely on their status as easement holders. *See* 32 F.3d at 1368-69 ("[W]e see no basis for holding that easement holders are owners for purposes of CERCLA liability.").

Case: 09-16585   06/28/2011   Page: 20 of 20   ID: 7799651   DktEntry: 66-1
Case 2:05-cv-02087-JAM-JFM   Document 322   Filed 06/28/11   Page 20 of 20

REDEVELOPMENT AGENCY v. BNSF RAILWAY           8755

**[17]** In *San Pedro Boat Works*, we recently explained that "the CERCLA framework holds liable both the passive *title* owner of real property who acquiesces in another's discharge of harmful pollutants on his real property . . . ('owner liability'), and the active (or negligent) operator of the facility who holds only a possessory interest in the real property but is in fact responsible for the discharge ('operator liability')." 635 F.3d at 451-52 (emphasis in original). The Railroads do not fall within either of these two categories: they did not hold title to the Property at the time of the contamination, and they are not in fact responsible for the discharge because they did not conduct operations related to the petroleum. Since the Railroads are not "owners" or "operators" under CERLCA, 42 U.S.C. § 9607(a)(2), they are not liable under the Polanco Act's CERCLA provision.

## V

The Railroads are not liable for the contamination at the Property under the common law of nuisance or under California's Polanco Redevelopment Act. Therefore, we need not reach the damages issues raised on appeal and cross-appeal. We reverse the grant of summary judgment for the Agency on the nuisance and Polanco Act-Water Code provision issues and remand for entry of summary judgment for the Appellants. We affirm the grant of summary judgment to the Appellants on the Polanco Act-CERCLA provision issue.

Costs are awarded to the Appellants.

**AFFIRMED in part; REVERSED AND REMANDED in part.**